David DAVIS, Plaintiff,

v.

Charles HALPERN, et al., Defendants.

No. CV–85–2052.

United States District Court,
E.D. New York.

June 5, 1991.

David Davis, pro se.

Clement Colucci, Asst. Atty. Gen., New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff David Davis, a white male, has applied for admission to and has been rejected from the City University of New York ("CUNY") Law School at Queens College every year since 1983 when the school opened. He initiated this lawsuit in 1985 against various officials of the law school, the City University of New York, and the State University of New York in their individual and official capacities alleging viola-tions of the Fourteenth Amendment, Title VI of the Civil Rights act of 1964, 42 U.S.C. § 2000d, *et seq.*, and of 42 U.S.C. §§ 1983 and 1985 seeking damages and injunctive relief. Since that time he has supplemented his complaint with some 18 additional defendants and claims of race, sex, and religious discrimination under 42 U.S.C. § 1981, 20 U.S.C. § 1681 prohibiting sex discrimination in education programs receiving federal financial assistance, and New York Education Law § 313 prohibiting discrimination in admission of applicants to educational institutions. The defendants include Charles Halpern, in his official and individual capacities as Dean of CUNY Law School; John Farago in his official and individual capacities as Assistant Dean of the law school; Joseph Murphy in his official and individual capacities as Chancellor of the City University of New York; Gordon Ambach in his official capacity as Chancellor of the State University of New York and as Commissioner of Education of the State of New York; James P. Murphy in his official and individual capacities as Chairperson of the Board of Trustees of the City University of New York; Haywood Burns in his official and individual capacities as Dean of the law school; Carlton Clark in his official and individual capacities as Director of Admissions of the law school; and various other individuals who are primarily past members of the admissions committees who rejected plaintiff's applications. Mr. Davis contends that defendants discriminated against him by favoring less qualified non-white, non-Jewish, and female applicants for admission through the use of a quota system, and that they rejected him in retaliation for bringing this and two prior state actions to obtain relief from this discrimination.

In 1987 this court rejected defendants' motion to dismiss for failure to state a claim upon which relief could be granted. While defendants urged the court that their admissions policy did not utilize a quota system for women or minorities and fully complied with the requirements of *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), this court ruled that

plaintiff's allegations were sufficient to state a claim, and that a Rule 12(b)(6) motion did not afford the court the opportunity to consider evidence regarding the actual operation of the admissions process.

Now, more than three years later and after extensive discovery by plaintiff, defendants return with this motion for summary judgment. For the reasons stated below, it is denied in part and granted in part.

### FACTS

The doors of the City University of New York Law School at Queens College opened in September 1983. Its founders sought then and continue to seek today an integration of the best that "traditional" legal education has to offer with "an expansive view of the function of law and lawyers in our current society." *1990–1991 CUNY Law School Catalogue*, at 7 [hereinafter *"Catalogue"*]. The curriculum has been designed to address the limitations of traditional legal education, whose "emphasis on private law, litigation, and on transactions between individuals can distort students' views of what law is and does in today's world ...," *id.*, and to utilize theory and practice which can "enhance our ability to provide students with the tools they need to best practice law in the service of human needs." *Id.*

Plaintiff's interest in CUNY Law School dates to its first semester, and was apparently due at least in part to its "public interest" orientation, state-subsidized tuition, and location near his home in New York City. While he says that he's "no scholar," he feels with great earnestness that his undergraduate grade point average ("UGPA") of 3.02, out of a possible 4.00, and his Law School Achievement Test ("LSAT") scores ranging from 17 to 25, out of a possible 48, qualify him for admission and he has submitted an application for that year and every year thereafter.

The admissions process by which he was rejected, now eight times, is the subject of this lawsuit. Its mechanics are not complex. Each applicant is required to fill out an application, to write a personal state-ment, and to register with the Law School Data Assembly Service through which the Admissions Committee will receive undergraduate grades and LSAT scores. Applicants are evaluated by either two or three members of the Admissions Committee made up of faculty and students, who may vote to admit, reject, or wait-list. If two members vote to admit and none votes to reject, the applicant is offered a seat. Likewise, two votes to reject with no vote to admit causes a rejection. If two members are split between rejection and admission, the application goes to a third member whose tie-breaking vote is determinative.

The factors which the committee members are instructed to consider in evaluating applicants are closely related to the ideals of the law school as an institution of legal education. They are set out in the law school's Statement of Admissions Policy, which appears in the *Catalogue*, at 38, submitted by both plaintiff and defendants:

The mandate of the City University of New York Law School at Queens College to serve human needs through law affects our admission process as much as it affects our curriculum. We evaluate applicants according to four criteria.

First, we seek people who are able to complete the program successfully. Because the Law School's program is intensive and intellectually demanding, we look for demonstration of strong academic ability, including skill at analysis, problem solving, and research....

Second, we look for indications that the candidate has a special affinity for our particular program. Assessment of academic ability alone will not dominate the application process. We will try to assess some of the less tangible qualities that make an outstanding lawyer, including judgment, energy, initiative, and the ability to work both collaboratively and independently....

Third, we try to select a diverse group of students, genuinely representative of the remarkable diversity of the City the School serves. We address our mandate in part by seeking students who would

otherwise be unable to attend law school, or who are members of populations that have traditionally been underserved by the law.

Finally, as an institution funded in large part by the taxpayers of the State of New York, we seek students who have some demonstrated connection to the State and, particularly, to the City. That connection may be manifested by residence, work experience, education experience, other service to the State and City, or a demonstrated special concern for the solution of urban problems.

Our experience has been that we receive many more qualified applicants than we accept. The admission process is therefore highly selective, and successful candidates are people who, in the opinion of the Admissions Committee, manifest unusual strength in more than one of these areas....

Especially relevant to the considerations of race and sex in the admissions process is the law school's affirmative action policy, which operates in accord with the admissions policy. That policy is set out in capital letters on the first substantive page of the *Catalogue*, and reads in its entirety:

THE FACULTY AND STAFF OF CUNY LAW SCHOOL AT QUEENS COLLEGE BELIEVE THAT WE HAVE A RESPONSIBILITY TO HELP CREATE A BAR THAT IS MORE DIVERSIFIED, AND MORE REPRESENTATIVE OF THE FULL RANGE OF PEOPLES THAT MAKE UP NEW YORK CITY AND THE UNITED STATES. ACCORDINGLY, WE ACTIVELY SEEK TO RECRUIT, EMPLOY, RETAIN, PROMOTE, AND TRAIN STUDENTS, FACULTY, AND STAFF OF ALL RACES, NATIONAL ORIGINS, CLASSES, AND BELIEF SYSTEMS, WITHOUT REGARD TO SEX OR SEXUAL PREFERENCE. THIS COMMITMENT IS REFLECTED IN ALL THAT WE DO, BEGINNING WITH OUR ADMISSIONS POLICIES: WE LOOK AT THE WHOLE APPLICANT IN ACCORDANCE WITH THE BROAD AND INCLUSIVE CRITERIA APPROVED

BY THE BOARD OF TRUSTEES OF THE CITY UNIVERSITY OF NEW YORK, DESCRIBED IN DETAIL ELSEWHERE IN THIS BROCHURE.

Questions regarding this policy should be referred to Acting Associate Dean Victor M. Goode, Affirmative Action Officer

*Catalogue*, at 3. The law school's Director of Admissions, Carlton Clark, in his affidavit dated October 12, 1990 in support of this motion, sheds further light on the use of racial criteria in the admissions process:

Because minorities and other groups are underrepresented in the legal profession and because of the diverse composition of New York City and State and the Law School's commitment to diversity in its student body, membership in underrepresented groups is one of several factors, such as GPA and LSAT scores, which Committee members may consider, in determining an applicant's request for admission.

Clark Aff., ¶ 19.

In addition to the *Catalogue* and the Clark affidavit, defendants' submissions in support of its motion include portions of plaintiff's deposition testimony in which he states the names of the law schools from which he has been rejected, describes his interviews with members of the law school Admissions Committee, and includes the following exchange:

Q: ...

Now, other than what you have just discussed, have you at any point come across anything indicating that somebody establishes a number and says this is the number of a particular group that we have to have? You have given me a statistical analysis of your own as to why you think there's one there. I'm asking you have you seen anything where somebody says it exists.

A: Not in writing. I haven't had a chance to depose your clients yet. After I depose them, we'll find out what the story is.

Q: Is their unofficial quota also the same thing as you have referred to in the

case as holding seats or setting aside seats for minorities?

A: I would say it's the same thing, yes, in my opinion.

Q: And—

Q: It's up to the judge to decide.

Colucci Aff., Exh. A., at 222–23. They also submit portions of defendants' interrogatory responses which plainly deny any utilization of quotas—official or unofficial—in the selection process, and four "personal statements" submitted by plaintiff with his applications of 1983, 1984, 1986, and 1987. They also submit a document entitled "Preliminary Admissions Report and Analysis, 1982–1987" prepared by Carlton Clark, Colucci Aff., Exh. D, and some statistical data prepared in response to plaintiff's interrogatories reflecting the racial composition of the classes entering 1983 and 1984. Colucci Aff., Exh. E.

In support of his claim that the plan utilizes quotas, plaintiff has submitted pages of computer printed statistics which portray the academic, demographic, ethnic, and gender makeup of the law school's incoming classes. According to plaintiff's analysis, the data reveals that the law school consistently has admitted numbers of minority students whose LSAT scores and UGPA have been lower than or equal to those of plaintiff and of other white males not accepted. For instance, in the class entering September 1986, he states that 49 of the 56 black and hispanic students had LSAT scores equal to or lower than that of plaintiff's highest score. In the class entering September 1987 40 of 48 black and hispanic students had scores equal to or lower than plaintiff's highest. In the class entering September 1988 25 of 36 black and hispanic students had LSAT scores equal to or lower than plaintiff's highest. And in 1989, 30 of 45 black and hispanic students had LSAT scores equal to or lower than plaintiff's highest. It might be noted that these figures apply to admitted students who enrolled at CUNY, not all admitted students. Plaintiff's Aff. at ¶¶ 31–35. He also submits through his affidavit that the percentage of minority students at the law school is significantly greater than the percentage at three other New York area law schools, and higher than any other law school in the country with the exception of the four traditionally black law schools and the University of Hawaii.

Other data plaintiff submits suggest that the law school admits a higher proportion of female applicants than male applicants. For instance, he states that in 1983 56% of the candidates who applied were male while only 48% of those admitted were male. In 1984, 51% of applicants were male while 44% of those accepted were male. In 1985, 55% of applicants were male while 46% of those accepted were male. And in 1989, 51% of applicants were male while 43% of those accepted were male. *Id.* at ¶¶ 39–40.

Plaintiff has also submitted two series of weekly or biweekly internal law school memoranda addressed to members of the Admissions Committee reporting data in the categories of applications received, candidates accepted, and seat deposits received. Figures reported include average age, average LSAT score, average UGPA, percentage of females, percentage of minorities, and percentage of New York state residents. One series of memoranda dates from February 17, 1987 through September 9, 1987, Exh. 15 to Plaintiff's Memorandum of Law; the other from February 4, 1988 through June 24, 1988, Exh. A to Plaintiff's Reply Memorandum of Law.

Plaintiff also offers evidence which he contends supports his claim of retaliation. This includes answers to interrogatories, internal law school memoranda, notes taken by Admissions Committee members at plaintiff's interviews, and various letters by and to officials of the law school. He also points to a "conflict" in Dean Clark's affidavit between his statement that "[w]hen an applicant reapplies in subsequent years, we make an effort to have each subsequent application reviewed by members of the Admissions Committee who did not previously review that person's application," Clark Aff., ¶ 14, and his statement that he personally reviewed and voted on plaintiff's application in 1983, 1987, 1988, 1989, and 1990. *Id.* ¶ 17. Plaintiff

also submits through his affidavit that his application for admission to the class entering September 1985 was inexplicably delayed until August 27, 1985, a year in which the last applicant was offered admission on August 2. Plaintiff states that this rejection came only after he sent a letter complaining of the delay to Judge Sifton on August 23. In 1989, a decision on plaintiff's application was not made until late August as well, and only after this court admonished defendants regarding that delay.

Defendants contend that his rejections were due neither to discrimination nor to retaliation, but rather to his poor qualifications and poor comparison with competing applicants. However, they do not now, nor have they ever, challenged his standing to bring this lawsuit; rather, they reject plaintiff's contentions as not supported by the facts, and move for summary judgment upon their affidavits, exhibits and memoranda of law.

## DISCUSSION

*Title VI*

Plaintiff first claims that his rejections from the law school were the product of an admissions process which discriminates against white males in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Section 601 of Title VI states, in relevant part, that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." This provision has been interpreted to proscribe discrimination that violates the Equal Protection Clause of the Fourteenth Amendment. *See Regents of the University of California v. Bakke,* 438 U.S. 265, 287, 98 S.Ct. 2733, 2746–47, 57 L.Ed.2d 750 (opinion of Powell, J.), 325, 98 S.Ct. at 2766 (opinion of Brennan, White, Marshall and Blackmun, JJ.); *Ayers v. Allain,* 893 F.2d 732, 754 (5th Cir.1990); *Brown v. Board of Educ. of Topeka,* 892 F.2d 851, 887 (10th Cir.1989); *Detroit Po-*

*lice Officers' Ass'n v. Young,* 608 F.2d 671, 691 (6th Cir.1979).

■ The burdens of production and persuasion in a reverse discrimination case are set out in *Johnson v. Transportation Agency, Santa Clara Co.,* 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987). First, plaintiff bears the burden of stating a prima facie case that race or sex has been taken into account in the selection process. Second, the burden shifts to the decision-maker to articulate a nondiscriminatory rationale for the decision. In *Johnson,* it was held that "[t]he existence of an affirmative action plan provides such a rationale." *Id.* Third, if an affirmative action plan is articulated as the basis for the decision, the burden then shifts back to the plaintiff to demonstrate that "the rationale was pretextual and the plan is invalid." *Id.* In this regard the Supreme Court offered the following caution:

> As a practical matter, of course, [a defendant] will generally seek to avoid a charge of pretext by presenting evidence in support of its plan. That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the [defendant] to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.

*Id.* at 627, 107 S.Ct. at 1449.

■ Determining the constitutionality of an affirmative action plan based on race triggers strict judicial scrutiny. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 720–21, 102 L.Ed.2d 854 (1989). This is true even though a group potentially disadvantaged is not a discrete or insular minority, such as white males. Minority status "has never been invoked in our decisions as a prerequisite to subjecting racial or ethnic distinction to strict scrutiny. * * * Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Bakke,* 438 U.S. at 290–91, 98 S.Ct. at 2748 (Powell, J.). *See also, Wygant v. Jackson Board of Education,* 476 U.S. 267, 273, 106 S.Ct. 1842,

1846, 90 L.Ed.2d 260 (Plurality op.) ("The Court has recognized that the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination."), *reh. denied*, 478 U.S. 1014, 106 S.Ct. 3320, 92 L.Ed.2d 728 (1986); *City of Richmond v. J.A. Croson Co.*, 488 U.S. at 494, 109 S.Ct. at 721 (Plurality op.) ("reaffirm[ing] the view expressed by the plurality in *Wygant* that the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification.").

The notion that strict scrutiny apply equally to all racial or ethnic classifications has a broad rationale. First, if strict scrutiny applied only to some racial classifications and not to others, courts would be faced with the unmanageable and impractical task of determining in each case whether a group had or had not suffered some requisite level of historical discrimination entitling it to the most rigorous protection of the Fourteenth Amendment. Second, it is quite possible that classifications favoring minorities or other groups historically discriminated against are not benign at all but rather are injurious to otherwise innocent members of non-minority groups with no legitimate justification. Third, programs favoring minorities may be counterproductive on balance. "Preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth." *Bakke*, 438 U.S. at 298, 98 S.Ct. at 298 (Powell, J.). *See also, Croson*, 488 U.S. at 493, 109 S.Ct. at 721 (Plurality op.) ("Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility."); *DeFunis v. Odegaard*, 416 U.S. 312, 343, 94 S.Ct. 1704, 1719, 40 L.Ed.2d 164 (1974) (Douglas, J., dissenting) ("A segregated admissions process creates suggestions of stigma and caste no less than a segregated classroom,

and in the end it may produce that result despite its contrary intentions.").

■ Strict judicial scrutiny involves a two-fold inquiry. First it must be determined whether the body acting on the basis of suspect criteria is doing so in furtherance of a compelling state interest. The purpose of this first inquiry is to " 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant the use of a highly suspect tool." *Croson*, 488 U.S. at 493, 109 S.Ct. at 721 (Plurality op.). Second, the form and extent of the use of racial criteria in service of that purpose must be "specifically and narrowly framed to accomplish that purpose." *Wygant*, 476 U.S. at 280, 106 S.Ct. at 1850 (Powell, J.). "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Fullilove v. Klutznick*, 448 U.S. 448, 537, 100 S.Ct. 2758, 2805, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting).

■ While the use of racial classifications are highly disfavored and have been infrequently sustained by the Supreme Court, there are instances in which classifications serving proper purposes will be upheld. One such purpose is that of a university's obtaining the benefits which flow from enrolling an ethnically diverse student body. In *Bakke*, the Supreme Court said that the First Amendment interest in providing an environment which fosters the "robust exchange of ideas" makes the goal of diversity "of paramount importance in the fulfillment of [a university's] mission." *Bakke*, 438 U.S. at 313, 98 S.Ct. at 2760. While the court explicitly rejected the use of strict numerical quotas to achieve diversity, it endorsed the plans of many colleges and universities which consider race or ethnic background as one of many factors in weighing a candidate's strength. For instance, Justice Powell quoted approvingly from the Harvard College plan:

> The belief that diversity adds an essential ingredient to the educational process has long been a tenet of Harvard College admissions. Fifteen or twenty years ago, however, diversity meant students

from California, New York, and Massachusetts; city dwellers and farm boys; violinists, painters and football players; biologists, historians and classicists; potential stockbrokers, academics and politicians. The result was that very few ethnic or racial minorities attended Harvard College. In recent years Harvard College has expanded the concept of diversity to include students from disadvantaged economic, racial and ethnic groups. Harvard College now recruits not only Californians or Louisianans but also blacks and Chicanos and other minority students. Contemporary conditions in the United States mean that if Harvard College is to continue to offer a first-rate education to its students, minority representation in the undergraduate body cannot be ignored by the Committee on Admissions.

In practice, this new definition of diversity has meant that race has been a factor in some admissions decisions. When the Committee on Admissions review the large middle group of applicants who are "admissible" and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates's cases. A farm boy from Idaho can bring something to Harvard College which a Bostonian cannot offer. Similarly, a black student can usually bring something that a white person cannot offer.

*Bakke,* 438 U.S. at 322–23, 98 S.Ct. at 2764–65 (Appendix to Opinion of Powell, J.).

The Court has also indicated that racial classifications whose purpose is remedial and justified by the need to correct and undo the damaging effects of a specific prior practice of discrimination could be upheld under the Equal Protection Clause. Such remedial measures cannot be justified by the existence of societal discrimination alone. Rather, "the Court has insisted on some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination."

*Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 (Plurality op.). Thus, in *Wygant,* the Court struck down a plan which considered the minority status of teachers by tying the number of minority teachers who could be laid off to the percentage of minority students living in the school district. The board had justified the use of the classification on the grounds that statistical evidence appeared to indicate prior discrimination by the school board, *id.* at 277, 106 S.Ct. at 1848–49, and that providing the minority student population with "role models" might "alleviate the effects of societal discrimination." *Id.* at 274, 106 S.Ct. at 1847. But while the Court permitted that statistical evidence which indicated prior discrimination by the school board itself could provide a basis for the undertaking of race-conscious remedial measures, neither the District Court nor the Court of Appeals had found that the proffered statistical disparities constituted such a finding of prior discrimination by the school board and that basis was rejected. *Id.* at 278, 106 S.Ct. at 1849. Absent such a finding, the Board was conducting a remedial program with no guidance as to its duration, scope, and ultimate goal. Justice Powell then rejected the "role model" theory on similar grounds: Because it "does not necessarily bear a relationship to the harm caused by prior discriminatory hiring practices," it would "allo[w] the board to engage in discriminatory hiring practices long past the point required by any legitimate remedial purpose." *Id.* at 275–76, 106 S.Ct. at 1847. He then wrote:

Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy. The role model theory announced by the District Court and the resultant holding typify this indefiniteness. There are numerous explanations for a disparity between the percentage of minority students and the percentage of minority faculty, many of them completely unrelated to discrimination of any kind. In fact, there is no apparent connection between the two groups. Nevertheless, the District Court combined irrelevant comparisons be-

tween these two groups with an indisputable statement that there has been societal discrimination, and upheld state action predicated upon racial classifications. No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and overexpansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.

*Id.* at 276, 106 S.Ct. at 1848.

In *City of Richmond v. J.A. Croson Co., supra,* the Court struck down a set aside program for minority subcontractors in Richmond, Virginia which had been justified by the city council as remedial based on (1) its finding that while the general population of Richmond was 50% black, only .67% of the city's prime contracts had been awarded to minority-owned businesses during 1978–83; (2) its finding that contractor associations had no minority membership; (3) information regarding "the general conduct of the construction industry in this area, and in the State, and around the nation, ... in which race discrimination and exclusion on the basis of race is widespread"; and (4) Congressional findings of discrimination in the construction industry. *Croson,* 488 U.S. at 479–80, 499, 109 S.Ct. at 713–14, 724. However, there was no direct evidence of race discrimination on the part of the city in awarding contracts nor any evidence that the city's prime contractors had discriminated against minority-owned businesses. *Id.* at 480, 109 S.Ct. at 714. Rejecting the city's adoption of remedial measures under these conditions, the Court wrote:

Like the "role model" theory employed in *Wygant* a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. It "has no logical stopping point."

\* \* \* \* \* \*

It is sheer speculation how many minority firms there would be in Richmond absent past societal discrimination, just as it was sheer speculation how many minority medical students would have been admitted to the medical school at [the University of California at] Davis absent past discrimination in educational opportunities. Defining these sorts of injuries as "identified discrimination" would give local governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor.

*Id.* at 498–99, 109 S.Ct. at 723–24.

Lastly, in the university admissions context, in *Regents of the University of California v. Bakke, supra,* the Supreme Court rejected the University of California at Davis Medical School's use of race in its admissions process to the extent that it was not intended to remedy actual past or present discrimination by the admissions committee or achieve a diverse student body. The purposes the medical school said it was pursuing, in addition to diversity, were

(i) reducing the historic deficit of traditionally disfavored minorities in medical schools and in the medical profession; (ii) countering the effects of societal discrimination; (iii) increasing the number of physicians who will practice in communities currently underserved; ...

*Bakke,* 438 U.S. at 306, 98 S.Ct. at 2756–57 (citation omitted). In rejecting the first purpose, Justice Powell wrote:

If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid. Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake.

*Id.* at 307, 98 S.Ct. at 2757.

With respect to the goal of countering the effects of societal discrimination, Justice Powell wrote that not only had the University failed to make the required findings of constitutional or statutory viola-

tions, but that as an educational institution it inherently lacked the capability and the authority to make them:

> Its broad mission is education, not the formulation of any legislative policy or the adjudication of particular claims of illegality. For reasons similar to those stated [earlier], isolated segments of our vast governmental structures are not competent to make those decisions, at least in the absence of legislative mandates and legislatively determined criteria. Before relying upon these sorts of findings in establishing a racial classification, a governmental body must have the authority and capability to establish, in the record, that the classification is responsive to identified discrimination. Lacking this capability, [the University] has not carried its burden of justification on this issue.

*Id.* at 309–10, 106 S.Ct. at 2758 (Powell J.).

Finally, on the purpose of increasing the number of physicians serving underserved communities, the Court wrote that while in some instances a state's interest in facilitating the health care of its citizens may justify use of a suspect class, in this case the university had offered no evidence that a racial preference in its admissions process was necessary to promote that goal. *Id.* at 310, 106 S.Ct. at 2758–59. Justice Powell quoted approvingly from the decision of the Supreme Court of California:

> The University concedes it cannot assure that minority doctors who entered under the program, all of whom expressed an "interest" in practicing in a disadvantaged community, will actually do so. It may be correct to assume that some of them will carry out this intention, and that it is more likely they will practice in minority communities than the average white doctor. Nevertheless, there are more precise and reliable ways to identify applicants who are genuinely interested in the medical problems of minorities than by race. An applicant of whatever race who has demonstrated his concern for disadvantaged minorities in the past and who declares that practice in such a community is his primary professional goal would be more likely to con-

tribute to alleviation of the medical shortage than one who is chosen entirely on the basis of race and disadvantage. In short, there is no empirical data to demonstrate that any one race is more selflessly socially oriented or by contrast that another is more selfishly acquisitive.

*Id.* at 310–11, 106 S.Ct. at 2759, *quoting Bakke v. Regents of the University of California*, 18 Cal.3d 34, 56, 132 Cal.Rptr. 680, 553 P.2d 1152, 1167 (1976).

In reviewing the evidence before the court describing the policy and process of CUNY Law School's admissions program, the court is guided by several recent decisions of the Supreme Court bearing on the use of a motion for summary judgment. Firstly, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986), the court stated:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rules prior to trial, that the claims and defenses have no factual basis.

In *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), however, the Court said:

> When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Commenting upon that statement in *Matsushita,* the author in Childress, A New Era for Summary Judgments: Recent Shifts at the Supreme Court, 116 F.R.D. 183, 186 (1987), wrote:

> This language makes clear that summary judgment acts in a parallel fashion to the *trial* motion for a directed verdict, allowing a grant if the nonmovant plaintiff fails on substantive proof even before trial. This strengthens the perception that summary judgment allows weak *factual* claims to be weeded out, not just the facts that have no legal import; "genuine" allows some quantitative determination of sufficiency of the evidence.

And finally, in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court again emphasized that granting a motion for summary judgment requires that there be no *genuine* issue of *material* fact. "Only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment.... [S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. The Court went on to instruct that "[i]f the evidence is merely colorable, ... or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511.

██ Having never shown that its applicants' sex has ever played any role in the law school's admissions decisions, plaintiff has failed to make out a prima facie case of sex discrimination. The only material plaintiff has submitted relevant to the sex discrimination claim is statistical data which reveal that female applicants have a higher admission rate than male applicants. Apparently, more males than females generally apply each year, but more females are admitted. This statistical data without more is insufficient to state a prima facie case of discrimination. The Supreme Court has held, and the Second Circuit has energetically reminded the district courts, that a prima facie case of disparate impact "comprises both disparity and causation;" that is, that a

> plaintiff does not make out a case of disparate impact simply by showing that, "at the bottom line," there is a racial *imbalance* in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.
>
> \* \* \* \* \* \*
>
> [E]ven if on remand respondents can show that non-whites are underrepresented in the at-issue jobs, ... this alone will *not* suffice to make out a case of disparate impact. Respondents will also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking ...

*Equal Employment Opportunity Comm'n v. Joint Apprenticeship Cte.,* 895 F.2d 86, 90 (2d Cir.1990), *quoting Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). The Supreme Court added in *Wards Cove* that "[t]o hold otherwise would result in employers being potentially liable for the 'myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Wards Cove Packing Co. v. Atonio,* 490 U.S. at 657, 109 S.Ct. at 2125.

Plaintiff has offered no evidence that there exists any improper practice at the law school which has caused the statistical disparity between the success of men and women applicants, a want fatal to the sex discrimination claim. The briefest indulgence in conjecture assures us that this should be the case. Women applicants to CUNY may, on the average, have better academic qualifications then the male applicants. They may have a greater affinity for CUNY Law School's unique curricular approach. They may display greater enthusiasm for the type of public service careers for which CUNY endeavors to prepare its students. Any number of legitimate reasons may account for the dispari-

ty; that some unidentified and not alluded to discriminatory practice does so may not and will not be assumed.

■ Plaintiff has, however, established a prima facie case of discrimination with respect to race and ethnicity, since a significant body of undisputed evidence clearly demonstrates that these factors are considered in defendants' admissions decisions. Clark Aff., ¶ 19. *See Johnson v. Transportation Agency, Santa Clara Co.*, 480 U.S. at 626, 107 S.Ct. at 1449. Defendants have rebutted that prima facie case by articulating a legitimate reason for the use of these criteria—the existence of an affirmative action plan, set out on page 3 of the *Catalogue. Id.* The existence of the plan is not in dispute, either. The question this court must decide, then, is whether defendants have demonstrated that there is no material issue of fact as to whether they utilize these suspect criteria for permissible purposes, and if so, whether the means chosen to achieve them is proper. More specifically, the court asks whether CUNY Law School's consideration of race and ethnicity is, without question, limited to the goal of diversity or remedying past discrimination by the law school, and if so, whether it eschews the use of numerical quotas or some other means which, in this context, would be improper.

It is not disputed that CUNY Law School considers one of the goals of its admissions program the assembly of a racially and ethnically diverse student body. *See* Statement of Admissions Policy, *Catalogue*, at 38. However, the evidence suggests that the law school may also consider racial or ethnic criteria for another reason: the low number of minority members of the bar and the manifestly low proportion of minority lawyers in a city in which minority populations are in dire need of legal services. For instance, Director of Admission's Clark, in his affidavit, states:

The Law School has no quotas by race or sex, and does not set aside seats for minorities or any groups. Because minorities and other groups are underrepresented in the legal profession and because of the diverse composition of New York City and State and the Law School's commitment to diversity in its student body, membership in underrepresented groups is one of several factors, such as GPA and LSAT scores, which Committee members may consider, in determining an applicant's request for admission.

Clark Aff., ¶ 19. Moreover, the law school's affirmative action policy, *Catalogue*, at 3, quoted above in full, states that a goal of the law school is "to help create a bar that is more diversified, and more representative of the full range of peoples that make up New York City and the United States...'. This commitment is reflected in all that we do, beginning with our admissions policies...." It states that "the law school pursues that goal by actively seek[ing] to recruit, employ, retain, promote, and train students ... of all races, national origins, classes, and belief systems, without regard to sex or sexual preference." The Statement of Admissions Policy is susceptible to a similar inference, for it seems to confuse or merge the goal of diversity, whose intent is to cultivate a richer academic environment, with that of the remedial consideration of race and ethnicity, which in this case seems directed at addressing the inadequate minority representation in the legal profession:

[W]e try to select a diverse group of students, genuinely representative of the remarkable diversity of the City the School serves. We address our mandate in part by seeking students who would otherwise be unable to attend law school, or who are members of populations that have traditionally been underserved by the law.

If the policy expressed in these statements is a simple preference for members of certain minorities over other individuals, then it is unconstitutional as "discrimination for its own sake." *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757. If it is to combat the effects of societal discrimination on the legal profession, then it is unconstitutional for its failure to be limited to the goal of remedying specific prior discriminatory practices by the law school. Neither side

in this case has proffered a shred of evidence suggesting that the law school has ever engaged in discrimination against those underrepresented groups. *See, Wygant,* 476 U.S. at 275–76, 106 S.Ct. at 1847–48. Lastly, if it is to produce lawyers committed to serving underrepresented segments of our population, it is unconstitutional not because the goal is an impermissible one for a state to pursue, but because "there are more precise and reliable ways to identify applicants who are genuinely interested in the ... problems of minorities than by race." *Bakke,* 438 U.S. at 311, 98 S.Ct. at 2759.

Counsel for the law school infers that one of these policies is at work. He wrote, in Defendant's Memorandum of Law, at 11–12, that the goals of attaining a diverse student body

> apply with special force at the CUNY Law School. Its mission, captured in its motto "Law in the service of human needs," is to train lawyers for public service and for what is known as "public interest" law. (Clark aff., Exhibit A). This court may take judicial notice that minorities disproportionately need and use the types of legal services CUNY law students are especially trained to provide.

*Id.* at 11–12. This issue was pursued at oral argument, with the following exchange:

> THE COURT: I take it, Mr. Colucci, that the purpose which CUNY law school seeks to serve in accepting a discrete segment of our population more readily than they do other discrete segments of our population, if I understand you correctly, is the belief that that population which is preferred in the admission process will serve some societal need, that there is an underrepresented class?
>
> MR. COLUCCI: That's correct, Your Honor.

██ *Bakke* makes clear that in the absence of prior discrimination by the university the consideration of race as one factor among many by a university admissions process is constitutional only so far as it seeks to procure for the university the educational benefits which flow from having a diverse student body. The fact that the City and State are ethnically diverse, the fact that the Bar may be too homogeneous, or the fact that minorities too often may not be able to find adequate legal representation cannot alone or in combination with one another, without more, support the consideration of race by the law school. The law school's remedial powers are limited, under the Equal Protection Clause, to addressing such discrimination as it specifically finds to have been perpetrated by its own institutions—not by our society at large.

As for the use of quotas to pursue its ends, however, the court concludes that defendants have demonstrated that no material issue of fact exists and that a rational jury could not, on the basis of the evidence presented by plaintiff, find that the CUNY Law School utilizes quotas in their admissions process. Their evidence is not copious. It consists of statements in interrogatories denying the use of quotas, a statement by plaintiff indicating his lack of actual proof of use of quotas, and the affidavit of Admissions Director Carlton Clark along with the law school *Catalogue,* both of which describe the admissions process without any reference to the use of quotas. That affidavit states that the law school's admissions process was designed around the "Harvard" model. *Clark* Aff., ¶ 7. This is describable at best as sparse, especially given the law school's unlimited access to its own admissions data and three years' opportunity to produce more detailed affidavits and analysis of its admissions process.

██ But plaintiff's evidence is even less substantial. After the same three years of discovery, plaintiff has failed to produce a shred of material which genuinely supports a conclusion that a quota might be in use. The fact that his scores are better than many blacks or hispanics admitted to the law school is not circumstantial evidence that a quota is in use. Neither is evidence that the admissions committee is regularly apprised of the racial, demographic, and sexual composition of the applicants, accep-

tees, and enrollees. And neither is the fact that the percentage of minorities enrolled at CUNY Law School is higher than that at most law schools. That fact may reflect the composition of the applicant pool, the qualifications of those applicants, or the desire of minorities or women to attend CUNY Law School. It is not evidence of the use of quotas.

This court recognizes that law schools, like employers, rarely leave a "smoking gun" or "paper trail" identifying a discriminatory procedure. *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir.1989). Plaintiff's case that quotas were used would have to be built from pieces of circumstantial evidence of the kind often best left to the evaluation of a jury. But in the absence of any such evidence to set against the emphatic denials and the descriptions of the admissions process submitted by defendants, there remains no reason to allow this theory to go to a jury. Plaintiff must produce "solid circumstantial evidence" to support his claim that quotas are being used, *see Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.1990); *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2d Cir.1987); he has not done so and his resistance to this motion must, therefore, fail.

■■■ The fact that the law school's admissions department may eschew quotas and adhere assiduously to the "Harvard Plan," alluded to favorably by Justice Powell in *Bakke*, 438 U.S. at 316–18, 98 S.Ct. at 2761–63, under which the school considers race along with other criteria for admission and deems it simply a "plus" in an applicant's favor, does not shield it from the constitutional prerequisites to remedial consideration of race. The Harvard Plan is a race-conscious approach to selection among candidates which places a premium on membership in certain ethnic groups. While it is free of the exclusive attributes of strict numerical quotas, it is still a "racial preference," *Howard v. McLucas*, 671 F.Supp. 756, 767 (M.D.Ga.1987), and is applied in remedial contexts as a measured response to findings of prior discrimination where the imposition of a quota would be

excessive. *See, e.g., Johnson v. Transportation Agency, Santa Clara Co.*, 480 U.S. at 638, 107 S.Ct. at 1455 (plan "resembl[ing] the Harvard Plan" implemented to remedy effects of discrimination in county transportation agency); *Higgins v. City of Vallejo*, 823 F.2d 351, 358–59 (9th Cir.1987) (plan similar to "Harvard Plan" implemented to remedy past discriminatory employment practices of city fire department). While it is a perfectly appropriate, and legal, means to achieve diversity, as a remedial measure it must be justified by a proper showing of discrimination. Thus in *Johnson, supra*, the court required that defendant's plan, which "authorized the consideration of ethnicity or sex as a factor when evaluating qualified candidates," *Johnson*, 480 U.S. at 622, 107 S.Ct. at 1447, be justified by the existence of conditions warranting remedial measures under Title VII. *Id.* at 631, 107 S.Ct. at 1452. And in *Higgins, supra*, the court required "a showing of prior discrimination by the governmental unit whose affirmative action program is under scrutiny" before approving defendant's "Harvard Plan" for hiring in its fire department. *Id.* at 358–59.

In the case at bar, as noted earlier, defendants have neither proffered nor alluded to evidence that CUNY Law School ever engaged in any prior discrimination harming the minorities now favored. There is no evidence of a CUNY Law School policy that discriminated directly against those groups, of a CUNY Law School policy otherwise neutral but producing a disparate impact harmful to those groups, or of individuals at the CUNY Law School who ever harbored racial animus and activated it against those groups in the admissions process. Moreover, although alone it would not justify a race-conscious remedy under Title VI, there is no evidence even of a statistical disparity between the composition of the group of accepted applicants and any relevant population of comparison.

Because this material sustains plaintiff's contention that a triable issue of fact exists as to whether the process by which he was eight times considered and eight times rejected utilizes minority status in a way which violates the Fourteenth Amendment,

defendant's motion to dismiss the Title VI claim is denied. Because, however, no similar issue remains as to their use of sex in the admissions process, the motion is granted as to all claims of sex discrimination under Title 42, United States Code, and 20 U.S.C. § 1681.

### §§ 1981–1983

 With respect to the claim under § 1981, which prohibits discrimination violating the Constitution interfering with an individual's right to make contracts, at no point in this motion did defendants argue that that right does not embrace the conduct here. It suffices to say at this point that the Supreme Court has made it clear that § 1981 will support a claim of reverse discrimination. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295–96, 96 S.Ct. 2574, 2585–86, 49 L.Ed.2d 493 (1976). *See also Holland/Blue Streak v. Barthelemy*, 849 F.2d 987, 989 (5th Cir. 1988); *Al–Khazraji v. St. Francis College*, 784 F.2d 505, 519–20 (3d Cir.1986) (Adams, C.J., concurring). The motion as to this claim is therefore denied.

Section 1983 proscribes conduct under color of state law which deprives a plaintiff of a right guaranteed by the federal Constitution or laws. Defendants have never contested that state action exists here, and this claim, therefore, withstands this motion as well.

The § 1985 claim is more problematic as at least one court has held that § 1985(3) (which I assume is the subsection plaintiff had in mind) which prohibits conspiracies to violate a plaintiff's civil rights, does not embrace reverse discrimination of the type complained of here. *Marsh v. Bd. of Educ. of the City of Flint*, 581 F.Supp. 614, 617–18 (E.D.Mich.1984), *aff'd without op.*, 762 F.2d 1009 (6th Cir.1985), *vacated on other grounds*, 476 U.S. 1137, 106 S.Ct. 2240, 90 L.Ed.2d 688 (1986). However, this argument has not been made here, and the issue has not been briefed. Nor has it been argued that defendants' conduct would not be proscribed because it lacks the conspiracy or some other element of the statute. *See United Brotherhood of Carpenters and Joiners of America, Local 610 v.*

*Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983). This claim will not, therefore, be dismissed at this time.

### N.Y. Education Law § 313

 Defendants argue that the claims under New York Educ. Law § 313 should be dismissed because the law authorizes no private right of action. Section 313 prohibits educational institutions in New York from engaging in admissions practices which discriminate on the basis of race, color, sex, religion, creed, marital status, age, or national origin. It also explicitly describes the procedure an aggrieved person must follow to obtain relief under the statute, which begins with filing a petition with the Commissioner of Education. Claims the Commissioner finds probable cause to credit are pursued informally by him or formally through his complaint to the Board of Regents. § 313(5). The statute provides for judicial review of the determination of the Board of Regents, by request of the Board of Regents, § 313(6)(a), or by any person aggrieved by a decision of the Board by proceeding under CPLR Article 78. § 313(6)(b). The New York courts have not spoken on the issue of whether there is a private right of action under § 313, but in view of the explicit designation of remedies and procedures, this court will not imply one. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979) ("it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). Plaintiff's claims under Educ.Law § 313 are therefore dismissed.

### Official Capacity Defendants

 Defendants also move for dismissal of all claims, other than those asserted under Title VI, brought against them in their official capacity on the ground that they are barred by the Eleventh Amendment. After much evolution that amendment now embodies the rule that "a suit by private parties seeking to impose a liability

which must be paid from public funds in the state treasury is barred." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 *reh'g denied*, 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974). This rule contemplates actions against individual officials when the state itself is not a named party but is the real party in interest. *Ford Motor Co. v. Department of the Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350–51, 89 L.Ed. 389 (1945).

 The court has no reason to doubt that the New York statutory scheme would require the damages plaintiff seeks to be paid out of the state treasury. *See Ritzie v. City University of New York*, 703 F.Supp. 271 (S.D.N.Y.1989). Dismissal is thus appropriate as to the claims for monetary relief against official capacity defendants other than those claims under Title VI. As for the Title VI claims, while defendants have not moved against them on grounds of immunity, the court notes that Congress has expressly abrogated the states' Eleventh Amendment immunity for "violations [of Title VI] that occur in whole or in part after October 21, 1986." 42 U.S.C. § 2000d–7(b) (Supp.1987). However, prospective injunctive relief is available against state officials violating federal law, *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and dismissal is not, therefore, ordered as to claims for such relief.

### Claims against Victor Goode

Defendants' Memorandum of Law seeks dismissal of the claims against Victor Goode based on an absence of his participation in any denial of admission to plaintiff. Counsel refers to an Affidavit of Victor Goode, but no such affidavit was received by the court. Summary judgment as to these claims is therefore denied at this time.

### Claims against Education Chancellor Murphy

Counsel argues that there are no allegations of involvement in discrimination by Chancellor Murphy. This is incorrect. *See* Supplemental Complaint filed July 7, 1988, ¶¶ 27–51. As no evidence has been sub-

mitted disputing or demonstrating his involvement in the admissions policy or process, summary judgment as to these claims is denied.

### Claims against Commissioner Ambach

 No specific evidence has been submitted by either party as to the involvement of Commissioner Ambach in the admissions process at CUNY Law School. While counsel for defendants states in his brief that "[plaintiff] has no evidence whatsoever implicating the Commissioner in any wrongdoing," Defendants' Memorandum of Law, at 19, and this appears to be true as far as it describes what has been submitted in connection with this motion, this statement alone does not carry defendants' burden of demonstrating, in light of the allegations against the commissioner, that no material issue of fact exists as to his liability. Summary judgment as to the claims against him is therefore denied.

### The Retaliation Claim

Plaintiff also alleges that the law school retaliated against him for his having brought this and other lawsuits against them. Although Title VI does not explicitly provide either for a private right of action for discrimination or for retaliation, a majority of the Supreme Court has held that a private right of action exists under Title VI, *see Guardians Ass'n v. Civil Service Comm'n of the City of New York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), and a federal regulation, 34 C.F.R. § 100.7(e) (1990), prohibits retaliation against one who attempts to enforce his rights under the statute:

> *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of any right or privilege secured by section 601 of the Act [Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

While research has found only one case interpreting this section, *Paisey v. Vitale,*

634 F.Supp. 741 (S.D.Fla.), *aff'd on other grounds*, 807 F.2d 889 (11th Cir.1986), that court held that a private right of action exists under the regulation, and stated that the anti-retaliation provision of Title VII, 42 U.S.C. § 2000e–3, is analogous.

 To state a prima facie case of retaliation, plaintiff must show (1) that he was engaged in a protected activity, (2) that his employer was aware of that activity, (3) that he suffered an adverse employment decision, and (4) that there was a causal connection between the protected activity and the adverse decision. *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). In *De Cintio v. Westchester County Medical Center*, 821 F.2d 111 (2d Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987), the court explained that

> [p]roof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986), or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1188–89 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985), or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant.

*Id.* at 115 (emphasis included). Once a plaintiff has established a prima facie case of retaliation, the burden of production then shifts to the defendant to state a "legitimate non-discriminatory reason" for the action. If defendant offers such a reason, plaintiff must then show that defendant's proffered reason is pretextual, and that its actual reason was retaliation. *Id.* This plaintiff may accomplish in either of two ways. Plaintiff may persuade the court with direct evidence that a discriminatory reason more likely than the proffered reason motivated the employer's decision. Or, plaintiff may indirectly persuade the court of pretext by showing that the employer's proffered explanation is not worthy of credence. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Because the establishment of a *prima facie* case alone raises an inference of discrimination, *Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir.1985), "[a] showing that a proffered justification is pretextual is itself sufficient to support an inference that the employer intentionally discriminated." *Ramseur v. Chase Manhattan Bank*, 865 F.2d at 465. The result that a case may turn completely on the issue of pretext follows from the system of proof established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973):

> [I]f the plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reasons, then the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent.

*Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1113 (2d Cir.1988), *quoting Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (3d Cir.), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Thus, at the summary judgment stage, a plaintiff may preclude dismissal of his claim by producing evidence from which a reasonable jury could conclude that the legitimate reasons proffered by the employer were pretextual.

 In this case, plaintiff has indisputably shown that he was engaged in Title VI discrimination litigation, that the law school was aware of the activity, *see* Exh. 3 to Plaintiff's Memorandum of Law, Memo from John Farago to "Past Members of the Admissions Committee, [et al.]," and that he has received eight consecutive rejections from the law school. To establish the causal connection element of the prima facie case, plaintiff has offered evidence of two of the types described by the Second Circuit: that he was treated differently than other applicants and that he may have been the subject of retaliatory animus. While Dean Clark stated in his affidavit, "When

an applicant reapplies in subsequent years, we make an effort to have each subsequent application reviewed by members of the Admissions Committee who did not previously review that person's application," Clark Aff., ¶ 14, Clark apparently reviewed and voted on plaintiff's application in 1983, 1987, 1988, 1989, and 1990. *Id.* ¶ 17. Plaintiff also points to the fact that a decision on his 1985 application was inexplicably delayed until August 27, 1985, a year in which he asserts that the last applicant was offered admission on August 2. He states that this rejection came only after plaintiff sent a letter complaining of the delay to Judge Sifton on August 23. A decision on his 1989 application was not made until late August as well, and only after this court admonished defendants regarding the delay.

Plaintiff also offers two internal law school memoranda on the subject of his litigation. The first, the memo from John Farago to "Past Members of the Admissions Committee, their Secretaries, the Admissions Office Staff, and relevant others at the law school and CUNY," Exh. 3 to Plaintiff's Memorandum of Law, contains the following paragraph:

> [David Davis] is a semi-professional pro se litigant. His basic technique is to wear down one's patience to a point where one either gives in to him or loses sufficient patience with him to appear bad on the record. In addition, he routinely misrepresents anything that is said to him and whipsaws people against each other, making chains of telephone calls and claims in which he informs one person that another has said something provocative.

The memo, to its credit, goes on to institute steps to "isolate" the application process from the litigation "so that we can genuinely state that our process has not been influenced by knowledge of the litigation." In the second memo, from "Rick" to "John F.," Exh. 4 to *id.*, the author recommends "insulating" members of the admissions committee from the litigation. He also wrote: "At the moment I am toying with the notion of starting a fourth fourth-semester concentration entitled Dealing with David Davis. This would get a quarter of our second-year students working full time to counter his various bizarre pro se whims."

In rebuttal, defendants have explained that plaintiff was rejected each year because after careful review of his application and its comparison with those of competing applicants, he was considered less qualified than other applicants. Their evidence demonstrates that they considered his grades and LSAT scores to be subpar, his basic skills to be lacking, and his public interest commitment insufficient.

But plaintiff has offered evidence raising a question of whether or not a jury would give those reasons credence. First, despite lengthy discovery and preparation for this motion, defendants have offered no legitimate reason why Davis' application was judged by the same reader for four consecutive years, apparently in violation of law school policy. Nor have they offered any explanation for why he was kept waiting until late August to learn of the Admissions Committee's decisions on two of his applications. Plaintiff has offered extensive statistical evidence which he hopes might show that his grades and scores should not have precluded his acceptance by the law school. He adds to that a statement by the law school that they admitted many applicants with "severe basic skills deficits," *see* Law School Self–Study, at 16, Exh. 1 to Plaintiff's Memorandum of Law, as well as a statement in a memorandum to Dean Clark, author unknown, that the school admitted "a pretty significant group that did not have any signs of public interest orientation." Exh. B to Plaintiff's Reply Memorandum of Law.

Just as it is the law school Admissions Committee, and not a court, that is best suited to determine the worthiness of the candidates whose applications come before it, it is the jury which is best suited to determine whether retaliatory motive has entered into any of those decisions. Plaintiff has demonstrated that the law school has treated him in ways not entirely consistent with their usual admissions procedure, and such treatment has not been ex-

plained. He has also offered evidence to demonstrate retaliatory animus on the part of some law school officials, including delays and statements which have not been explained. The role of this court upon a motion for summary judgment is to determine whether a rational jury could find that defendants' reasons are unworthy of credence—a determination in which the court must consider any evidence in the light most favorable to the nonmoving party. Because defendants' submissions do not foreclose that possibility, summary judgment dismissing the retaliation claim is denied.

In summation, defendants' motion for summary judgment is granted only as to claims of sex discrimination, claims under N.Y.Educ.Law § 313, and specified claims for money relief against defendants in their official capacities. The motion is denied as to the other claims.

SO ORDERED.