**Rubin George WESER, Plaintiff,**

v.

**Kristin Booth GLEN, et al., Defendants.**

**No. CV 97 4031(RJD).**

United States District Court,
E.D. New York.

Feb. 25, 2002.

Robert C. Keilson, Garden City, NY, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, By Stephanie Vullo and Benjamin Lee, Assistant Attorneys General, Of Counsel, New York City, for Defendants.

## CORRECTED MEMORANDUM OF DECISION

DEARIE, District Judge.

Plaintiff Rubin Weser challenges his denial of admission to the City University of New York Law School at Queens College (the "Law School") for the school years beginning in 1995, 1996 and 1997. Plaintiff asserts claims of discrimination based on religion, race and gender against the Law School and various members of the admissions committees. Defendants move for summary judgment on all claims. By order dated October 12, 2001, defendants' motion was granted. The reasons follow.

## BACKGROUND

The Law School is a New York State taxpayer-supported public institution created in 1983 to train public service lawyers. Plaintiff is a white, Jewish, seventy-nine-year-old retired businessman who, despite repeated efforts, has been denied admission to the Law School. The gravamen of plaintiff's complaint is that he has been discriminated against because he is a Jewish, white man. He contends that the Law School and its officials limited the number of seats available to white male applicants (Compl. ¶¶ 23, 55–56, 62–63), set aside seats for women (Compl. ¶¶ 37, 55–56), and subjected applicants to different standards based on race (Compl. ¶¶ 10, 50, 74), religion (Compl. ¶ 70a), and gender (Compl. ¶ 10), in accordance with an unconstitutional affirmative action plan. (Compl. ¶ 76). He further contends that the Law School continues to so discriminate. Defendants contend that plaintiff was denied admission not because of discrimination, but because his academic qualifications and commitment to public service were judged lacking as compared to other applicants. As difficult as it may be for plaintiff to accept, the evidence does not support his claims, and no genuine issue of material fact remains for the fact-finders.

### Admissions Policy and Procedures

Plaintiff challenges the Law School's admissions policy that was in place when he applied for admission for the 1995, 1996 and 1997 school years. That policy states:

## ADMISSIONS POLICY

The mandate of the City University of New York School of Law at Queens College to serve human needs through law affects our admission process as much as it affects our curriculum. We evaluate applicants according to four criteria:

**1. We seek people who are able to complete the program successfully.**

The Law School's program is intensive and intellectually demanding. Thus, we look for a demonstration of strong academic ability, including skill at analysis, problem solving, and research. To this end, we look at past academic performance and scores on the Law School Admission Test. But we also look beyond these to other demonstrations of academic promise. Work competed since college, other demanding intellectual activities, extraordinary letters of recommendation, and anything else that candidates bring to our attention in the application are carefully taken into account.

**2. We look for indications that the candidate has a special affinity for our particular program.**

Assessment of academic ability alone does not dominate the application process. We try to assess some of the less tangible qualities that make an outstanding lawyer, including judgment, energy, initiative, and the ability to work both collaboratively and independently. Past work or extra-curricular experience, the individual's reasons for wanting to attend law school, experiences that demonstrate a commitment to public service or that suggest an openness to a practice that captures the spirit of the School's mission, are all factors that are considered and can be dispositive.

**3. We try to select a diverse group of students.**

Our students must be academically able and genuinely representative of the remarkable diversity of the City the Law School serves. We actively recruit, among others, students who are members of populations that have traditionally been underserved by the law and underrepresented by the profession.

**4. We seek students who have some demonstrated connection to the State and, particularly, the City, because we are an institution funded by the State of New York.**

That connection may be manifested by residence, work experience, educational experience, other service to the State and City, or a demonstrated special concern for the solution of urban problems.

We receive many more qualified applications than we can accept. The admission process is therefore highly selective and *successful candidates are people who, in the opinion of the Admissions Committee, manifest unusual strength in more than one of these four areas.....*

(1995–1996 Application, Ortiz Decl., Ex. A; 1996–1997 Application, Burnett Decl., Ex. A) (emphasis in original). Plaintiff contends that this policy was and is part of an unconstitutional affirmative action plan and that, pursuant to the policy, the Law School sets aside seats and applies different admissions standards based on religion, race and gender. Defendants contend that, as clearly outlined in the applications, candidates are evaluated based on academic preparedness and demonstrated commitment to public service. In addition, because the school is a New York State taxpayer-supported institution, ties to New York are considered. According to defendants, diversity in terms of race, national origin, gender, age and disability is achieved by actively re-

cruiting a diverse applicant pool and not by preferences in the admissions process.

The admissions committee utilizes two review processes: one for applicants with Law School Admission Test ("LSAT") scores of 140 or above[1] and another for those with LSAT scores below 140. For the former, complete applicant files are reviewed by two members of the admissions committee who are anonymous to each other. Each reviewer recommends that the applicant be accepted, rejected, or placed on the wait list. If the reviewers disagree, a third member of the admissions committee reviews the file. After an independent review of each applicant file, the admissions committee decides whether to accept the reviewers' recommendations.

Pursuant to a policy set by the Law School's faculty, each year a maximum of eight applicants with LSAT scores below 140 may be offered admission.[2] One annually designated member of the admissions committee reviews the completed files of all applicants with such scores. That individual examines each application for evidence of academic preparedness and commitment to public service and determines whether the application warrants further review by members of the admissions committee despite the low LSAT score. If the initial reviewer decides the application does not warrant further review, the process ends, and the admissions committee generally does not act on that application. If the reviewer determines that the application does warrant further consideration, the application is reviewed by two or more members of the admissions committee. The admissions committee then grants or denies admission. The reviewer, acting alone, does not have the authority to grant admission. (*See* Letter from Stephanie Vullo, dated February 9, 2001; Ortiz Decl. ¶¶ 9–10; Burnett Decl. ¶¶ 9 & 17; Perez Decl. ¶ 9).

Admissions forms for the relevant years asked applicants to voluntarily identify their race and national origin. The forms state that the information has no bearing on admissions or academic decisions. Applicants were also asked to identify their gender. Applicants were not asked to identify their religion.

### Plaintiff's Applications

As previously stated, plaintiff is a white, Jewish, male born in 1922. After a full career as founder and owner of an insurance brokerage firm, he graduated from the State University of New York Empire State College ("Empire State College") in 1992, with a grade-point average ("GPA") of 3.78. Plaintiff took the LSAT for the first time in 1991 and received a score of 127. He took the LSAT again in 1994 and received a score of 133.

Empire State College requires its graduates to complete 128 credits to graduate, but students may receive advanced standing credits towards this requirement for learning from other sources. Plaintiff was awarded fifty-six advanced standing credits for his experience in the insurance and securities industry and other life experiences.[3] Plaintiff earned the remaining

---

1. The maximum possible score is 180. In the past, LSAT scores were out of a possible 48. On that scale, a score of 21 is equivalent to a score of 140 out of 180. (*See* Report on City University of New York School of Law, March 12–15, 1995, at 57, Weser Decl., Ex. Y).

2. This policy was instituted in 1989. (Letter from Stephanie Vullo, Esq., dated February 9, 2001, at 4; *see also* Report on City University

of New York School of Law, March 12–15, 1995, at 57, Weser Decl., Ex. Y).

3. Specifically, he earned advanced standing credit in Introduction to Monetary Economics, Direct Marketing, Advertising and Promotion, Small Business Development/Entrepreneurship, Small Business Management, Supervision, Risk Prevention and Purchasing Groups, Estate Planning, Salesmanship, Prin-

seventy-two credits needed to graduate through the completion of eighteen "contract" courses. From the record, it appears that contract courses were essentially independent study courses designed by the student and a "mentor." Course work included discussions, written summaries of assigned readings, essays and term papers. Each mentor wrote a "contract evaluation" for the course and assigned a letter grade equivalent. Plaintiff's 3.78 GPA is the average of the grade equivalents earned in the eighteen contract courses. The contract evaluations attached to the formal transcript from Empire State College indicate that plaintiff did not have traditional classroom instruction and that the contract courses did not include formal exams.

Plaintiff's applications for 1995, 1996, and 1997 included a number of letters of recommendation. Two of plaintiff's professors from Empire State College wrote strong letters of recommendation indicating that each had ample opportunity to assess plaintiff and that he was motivated and prepared to succeed in law school. Specifically, Professor Armstrong, who taught plaintiff several courses including "Logic and Rhetoric," wrote of plaintiff:

Rubin Weser is one of those most unusual people: someone who seeks to give to others more than he receives from them.

. . . .

His talents and skills are well suited to the law. He has a highly developed intelligence with strong skills in analysis, making subtle distinctions, and in thorough-going examination of a problem. He is well-spoken and articulate;

he is unafraid of confrontation, although he hesitates to instigate it; and he shines at debate or written argument. He will be a model law student.

(Ortiz Decl., Ex. E at Bates No. 417; Burnett Decl., Ex. B at Bates No. 449; Scott Decl., Ex. A at Bates No. 494). Professor Brown, plaintiff's evaluator for "The Supreme Court and the Constitution" and "Constitutional Issues," wrote:

He went far beyond what was expected of him by probing into the intricate details of the legal questions we analyzed. He showed a good ability to see alternative perspectives on issues and to defend or critique each one. He was able to grasp complex issues, such as the opposing theories of interpreting the Constitution, much more quickly and thoroughly than other students.

(Ortiz Decl., Ex. E at Bates No. 420; Burnett Decl., Ex. B at Bates No. 445; Scott Decl., Ex. A at Bates No. 496). Plaintiff's applications included a letter from State Senator Frank Padavan, who had not personally met plaintiff, suggesting that he was a worthy candidate for admission based on his vita. Edward Saueracker, Ph.D., Dean of Assessment at Empire State College, also wrote a letter, included in plaintiff's 1996 and 1997 applications, indicating that plaintiff's transcript, although "a bit off-putting," evidenced his ability to succeed in law school. (Burnett Decl., Ex. B at Bates No. 447; Scott Decl., Ex. A at Bates No. 498). In addition, the chairman of the Knights of Pythias, a philanthropic fraternal organization of which plaintiff was a member, wrote a letter on plaintiff's behalf that briefly describes the organization.[4]

---

ciples of Property and Casualty Insurance, Principles of Life Insurance, Principles of Health and Accident Insurance, General Securities, Yiddish Language, and the Movies. (Ortiz Decl., Ex. E).

4. In his letter, the chairman of the Knights of Pythias lists the following as examples of philanthropic causes the Knights of Pythias participates in:

In his personal statement, plaintiff urges the admissions committee to consider his approximately fifty years of work experience in the insurance industry as further evidence of his academic preparedness,[5] his thirty-year membership in the Knights of Pythias and membership on its Handicapped Children Committee as evidence of his commitment to public service,[6] and his forty-year residence in Whitestone, Queens as evidence of his ties to New York. He states that he intends to use his law degree to help the elderly practicing elder law and advising, on a pro bono basis, community boards and legislative committees on drafting legislation concerning the elderly. Specifically, he writes:

> I intend to use my law degree to continue to help the community, specifically the community of the elderly. I will practice elder law. There is a great need for people who understand the problems of the elderly so as to be able to counsel them as to their civil rights regarding the law applicable to health care and even to their right to be properly maintained in a nursing home or other care facility should it become necessary. I identify with the elderly and empathize with their needs.
>
> I also propose serving in an advisory capacity on a pro bono basis on community boards and legislative committees dealing with drafting legislation concerning the elderly. Too often issues concerning the elderly are handled by those who, while well-intentioned, are unable to fully comprehend and identify with the full spectrum of the concerns of the population of older people. I do have such an understanding and am able to deal with the elderly with respect for their dignity that they have earned.

(Ortiz Decl., Ex. E at Bates No. 422–23; Burnett Decl., Ex. B at Bates No. 443–44; Scott Decl., Ex. A at Bates No. 488–89).

### Review of Plaintiff's Applications

Because plaintiff's highest LSAT score was a 133, plaintiff's applications were subject to the review procedure reserved for applicants with LSAT scores below 140.

1. Sending underprivileged children to summer camps;
2. Arranging nursing homes for the elderly;
3. Donating funds to various charities such as: Deborah Hospital Foundation. Ronald McDonald House, Juvenile Diabetes Foundation, etc.

(Ortiz Decl., Ex. E at Bates No. 415; Burnett Decl., Ex. B at Bates No. 446; Scott Decl., Ex. A at Bates No. 497).

5. Regarding his work experience and academic preparedness, plaintiff states:

> I founded and owned my own insurance brokerage firm for more than fifty years, building a small business into a major insurance brokerage. I was constantly required to analyze and interpret very technical insurance documents and tailor these legal instruments to the needs of my clients. This required a thorough and detailed knowledge of the laws and regulations applicable to insurance and a deep understanding of all the pertinent agreements, exclusions, amendments, and endorsements. I have licenses for life and health, annuities, general securities, property and casualty. I was successful because I fought for my clients and gave them the best advice available, based on research and knowledge. My background in the insurance business has prepared me for the study of law which requires analytical reasoning and comprehension.

(Ortiz Decl., Ex. E at Bates No. 422; Burnett Decl., Ex. B at Bates No. 443; Scott Decl. Ex. A at Bates No. 488).

6. Specifically, he states that as a member of the Committee on Handicapped Children he helps "formulate and carry out policies to aid [the] children ... raise funds for their care and visit with them, spending time talking to them while assuring them that we genuinely care about them." (Ortiz Decl., Ex. E at Bates No. 422; Burnett Decl., Ex. B at Bates No. 443; Scott Decl., Ex. A at Bates No. 488).

Plaintiff's 1995 application was initially reviewed by defendant Victoria Ortiz, Dean of Students at the Law School and Acting Director of Admissions for the Law School from February 1994 through June 1995. Plaintiff's 1996 application was initially reviewed by Sybil L. Burnett, Director of Admissions for the Law School from August 1995 until January 1997. Plaintiff's 1997 application was initially reviewed by Bettie Scott, Associate Director of the Library at the Law School and a member of the Admissions Committee from 1996 through 1997. In both 1995 and 1997, the initial reviewer of plaintiff's application, Ortiz and Scott, respectively, determined that no further review of the application was warranted. In 1996, Burnett referred plaintiff's application for further consideration. Plaintiff was ultimately rejected by the committee.

Defendants maintain that plaintiff was denied admission because of his low LSAT score, his academic record, and his lack of demonstrated commitment to public service. According to defendants, plaintiff's admittedly high GPA from Empire State was discounted in the overall assessment of his academic preparedness because of the lack of formal examination and classroom instruction in the contract courses. In addition, defendants found many of the evaluations to be "conclusory" and "focused more on how hard plaintiff tried to complete his assignments than anything else." (Ortiz Decl. ¶ 19). Defendants also found that the evaluations "questioned, and in some cases, criticized, plaintiff's analytical and problem-solving skills" and "indicated that the plaintiff had difficulties understanding other people's perspectives." (Scott Decl. ¶ 18). Further, defendants found inconsistencies between the written contract evaluations and the assigned grade equivalents. For example, in "Philosophy of Law," the evaluator gave plaintiff an "A" despite indicating that plaintiff's paper was "competent" and that plaintiff avoided, and could use more rigorous practice with, detailed analysis. (Ortiz Decl. ¶ 18 & Ex. E at Bates No. 412). In "Right to Privacy" the evaluator gave plaintiff an "A" yet noted that plaintiff "prefers to rely on other people's analysis rather than go through the trouble doing his own" and that his "skills or desire to undertake detailed, critical, analysis are weak." (Ortiz Decl. ¶ 18 & Ex. E at Bates No. 413). In addition, in "Logic and Rhetoric," a course in which plaintiff earned an "A," the evaluator noted that plaintiff had "a tendency to move through material too quickly...losing some of its depth." (Ortiz Decl., Ex. E at Bates No. 410). Other evaluations indicate a lack of focus. (Ortiz Decl., Ex. E at Bates Nos. 400, 406). The Court notes, however, that the evaluations also indicate that plaintiff's lack of focus "d[id] not detract from his careful summaries and his intelligence in understanding the meaning" and that plaintiff was "willing to struggle with ideas in order to learn new things." (Ortiz Decl., Ex. E at Bates Nos. 400, 408).

With respect to plaintiff's desire to practice in the public interest, defendants contend that plaintiff's application, recommendations and personal statement failed to demonstrate an adequate commitment to public service or a compelling rationale for wanting to attend the Law School. According to Ortiz, "[p]laintiff's personal statement was filled with nothing but proposed public service activities that did not demonstrate a credible commitment." (Ortiz Decl. ¶ 20). According to Scott, plaintiff's personal statement was too general and filled with "aspirational goals" without explanation of "how [his] interest developed, what he wanted to do with the elderly, and how this related to earning a law degree." (Scott Decl. ¶ 20). Scott also criticized plaintiff for failing to ade-

quately explain "why or what had prevented him [sic] the past from pursuing [his] goal" of becoming a lawyer. (Scott Decl. ¶ 21). The Court notes, however, that plaintiff explains in his personal statement that he had been unable to pursue law earlier because he had a family to support. (Scott Decl., Ex. A at Bates No. 488). In addition, Ortiz and Scott state in their affidavits that they considered the letters of recommendation to be vague and generic, offering no explanation of why the recommenders believed plaintiff to be suited for law school in general or the Law School in particular. (Ortiz Decl. ¶ 21; Scott Decl. ¶ 23). Ortiz doubts plaintiff's public service commitment, noting that "the letter from the Knights of Pythias does nothing more than confirm plaintiff's membership. There was no indication of the public service plaintiff claims to have performed as a member." (Ortiz Decl. ¶ 21).

### The Complaint

The Amended Complaint, dated March 9, 1999, sets forth seven causes of action. At the outset, it states that the nature of the action is one:

> brought for violation of the rights of plaintiff to equal protection of the laws under the Fourteenth Amendment of the United States Constitution, and for racial, gender, and religious discrimination in violation of 42 U.S.C.1981, 1982, 1983, 42 U.S.C.2000d et seq. and 20 U.S.C. 1681 et seq.

(Compl.¶ 1). Plaintiff alleges that the Law School and its officials limited the number of seats available to white male applicants (Compl.¶¶ 23, 55–56, 62–63), set aside seats for women (Compl.¶¶ 37, 55–56), subjected applicants to different standards based on race, (Compl.¶¶ 10, 50, 74), religion (Compl.¶ 70a), and gender (Compl. at ¶ 10), and had an unconstitutional affirmative action plan. (Compl.¶ 76). He further alleges that the Law School continues to discriminate pursuant to such plan. Plaintiff claims that the Law School discriminated in admissions for 1995, 1996 and 1997 on the basis of race and gender in violation of Title VI, 42 U.S.C. § 2000d and Title IX, 20 U.S.C. § 1681, respectively. In addition, plaintiff claims that the Law School discriminated on the basis of religion without citing a particular statute violated. With respect to his claims pursuant to Title VI and Title IX, plaintiff seeks damages and injunctive relief. With respect to his claims of religious discrimination, plaintiff seeks only an injunction.

Without specifying the statute violated, plaintiff seeks damages from defendants Glen, the dean of the Law School, and Ortiz in their individual capacities for discrimination on the basis of race and gender. He seeks damages from defendant Scott in her individual capacity for discrimination on the basis of race, also without citing a specific statutory provision. In addition, plaintiff seeks damages from John and Jane Does, members of the admissions committee who reviewed plaintiff's application after Sybil Burnett's initial review.[7] He also seeks to enjoin Dean Glen and her agents from discriminating on the basis of race and gender, seeks an order admitting him to the Law School, and seeks a declaratory judgment that the Law School's alleged affirmative action plan is unconstitutional.

### DISCUSSION

Defendants move for summary judgment dismissing the complaint in its en-

---

**7.** The John and Jane Doe defendants are still unknown because, according to defendants, the relevant files have been destroyed.

tirety. Summary judgment will be granted when the moving party satisfies its burden of establishing that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment may be granted if the evidence favoring the nonmovant "is merely colorable ... or is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). As reiterated in *Anderson*, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*, 477 U.S. at 249, 106 S.Ct. at 2510.

When the nonmoving party bears the ultimate burden of proof at trial, as plaintiff does here, the moving party satisfies its burden of establishing that no genuine issue of material fact exists by pointing to "an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In order to defeat the motion, the nonmoving party:

> must come forward with evidence that would be sufficient to support a jury verdict in its favor. The motion will not be defeated merely ... on the basis of conjecture or surmise. The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading.

*Id.* (internal quotations and citations omitted). As set forth below, defendants' motion must be granted because plaintiff has failed to present any evidence that would

permit a rational jury to infer that he was the victim of discrimination.

### Standing

█ As an initial matter, defendants argue that plaintiff lacks standing. To have standing to sue, plaintiff must establish: (1) that he has suffered an injury in fact that is concrete and particularized rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and the conduct complained of that is traceable to the challenged conduct; and (3) that the injury will "likely" be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Defendants contend that plaintiff has failed to allege a cognizable injury that is likely to be redressed by a favorable decision in this action. Specifically, they argue that because plaintiff cannot demonstrate that "but for" his race, gender and religion, he would have been admitted to the Law School, or he would have been able to compete with other applicants for admission "on an equal footing," he has no standing to bring his claims.

█ A plaintiff challenging a discrete admissions decision has not suffered a cognizable injury warranting relief if it can be demonstrated conclusively that he nonetheless would have failed to qualify for admission absent the impermissible criteria. *Texas v. Lesage*, 528 U.S. 18, 20–21, 120 S.Ct. 467, 468, 145 L.Ed.2d 347 (1999). Such plaintiff has no standing. *Doherty v. Rutgers School of Law–Newark*, 651 F.2d 893, 899–901 (3d Cir.1981) (plaintiff had no standing to challenge law school's allegedly discriminatory admissions process because he did not have minimum required objective score for admission). As described above, the Law School does not rely on objective minimum requirements to automatically reject applicants, using instead a more subjective approach to admissions.

Although plaintiff's LSAT score was below 140, his application was not rejected outright for failure to achieve a cut-off score.[8] Moreover, others with the same LSAT scores have been deemed qualified to attend the Law School.[9] He therefore has standing to challenge his denial of admission.

■■■■ Plaintiff also has standing to seek forward-looking injunctive and declaratory relief. A plaintiff seeking redress for the ongoing denial of an opportunity to compete "on an equal footing" for admission need not establish that he would have been admitted absent the discriminatory criteria. *Lesage*, 528 U.S. at 21, 120 S.Ct. at 468–69. Such plaintiff need only show that he will apply for admission in the relatively near future. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211, 115 S.Ct. 2097, 2105, 132 L.Ed.2d 158 (1995) (contractors had standing to challenge federal program designed to provide contracts to disadvantaged business enterprises provided they could demonstrate that they would bid on contracts under the program in the relatively near future); *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993) (contractors challenging set-aside program need only demonstrate that they are ready to bid on contracts and a discriminatory policy prevents them from doing so on an equal basis); *see also Lesage*, 528 U.S. at 21, 120 S.Ct. at 468–69 (relevant injury is "inability to com-

pete on equal footing"). Plaintiff applied for admission to the Law School every year from 1992 to 1998. He has persisted in seeking a law degree from the school and states in the Amended Complaint that he "still desires to attend law school and become a lawyer," adequately demonstrating that he will seek admission again in the near future. (Compl.¶ 4). Accordingly, defendants' motion for summary judgment for lack of standing is denied.

### Title VI and Title IX Claims

As previously stated, plaintiff makes claims for damages and declaratory and injunctive relief against the Law School for discrimination on the basis of race and gender in violation of Title VI and Title IX. Section 601 of Title VI provides:

> [n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Title IX provides:

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...

20 U.S.C. § 1681(a). The Supreme Court recently held that no private right of ac-

---

8. Dean Glen's deposition testimony suggests that beginning in 1996 there may have been, as a practical matter, a cut-off of an LSAT score of 135 on the grounds that, based on the Law School's experience, an applicant with such a low score could not successfully complete the program. (Glen Dep. pp. 69–70, 111, 131, 134–35, Vullo Decl., Ex. C). However, defendants admit that there was no formal cut-off. In addition, in 1996, an applicant was admitted with an LSAT score of 134,

and plaintiff's application was referred by the initial reviewer for further consideration.

9. As discussed more fully below, two applicants with LSAT scores of 133 were admitted to the Law School in 1995. The Court notes, however, that the average of plaintiff's two LSAT scores is lower than any other admitted applicant for whom such information is available in the record.

tion exists to enforce regulations promulgated under Title VI prohibiting disparate-impact discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 1523, 149 L.Ed.2d 517 (2001). In doing so, the Court cast its decision in *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), finding a private right of action to enforce the Title IX ban on intentional discrimination, as one that did not consider whether a similar private right of action exists with respect to disparate-impact discrimination under Title IX. *Id.*, 121 S.Ct. at 1517 & n. 2. Because Title IX is derived from Title VI, *Alexander v. Sandoval* implies that no such private right of action exists under Title IX as well. *See id.; Cannon*, 441 U.S. at 694–703, 99 S.Ct. at 1956–1961 (discussing the modeling of Title IX on Title VI and Congress's intent to create comparable remedies under the two statutes). Thus, to the extent, if at all, plaintiff alleges disparate-impact discrimination, his claims must fail.[10]

 Plaintiff raises claims of intentional discrimination in violation of Title VI and Title IX. As reiterated in *Alexander v. Sandoval*, intentional discrimination proscribed by Title VI is discrimination that violates the Equal Protection Clause of the Fourteenth Amendment. *Id.*, 121 S.Ct. at 1516 (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)); *Davis v. Halpern*, 768 F.Supp. 968, 974 (E.D.N.Y.1991). Similarly, intentional discrimination proscribed by Title IX is discrimination that violates the Equal Protection Clause. An admissions policy is discriminatory on its face and violates the Equal Protection Clause if it expressly classifies persons on the basis of race or gender. *See Hayden v. County*

*of Nassau*, 180 F.3d 42, 48 (2d Cir.1999) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227–29, 115 S.Ct. 2097, 2105, 2112–14, 132 L.Ed.2d 158 (1995)). In addition, a facially neutral policy violates the Equal Protection Clause if it is applied in a discriminatory way. *See id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886)). Finally, if a facially neutral policy is motivated by discriminatory animus and its application results in a discriminatory effect, it violates the Equal Protection Clause. *See id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)). For the reasons set forth below, plaintiff's claims of intentional discrimination also fail.

### The Admissions Policy is Facially Neutral

Plaintiff alleges that the Law School's admissions policy was and is discriminatory, pointing to statements in the Law School catalog setting out and relating to the school's admissions criteria. Specifically, plaintiff contends that the third admissions criteria as well as text appearing at the front of the Law School catalog constitute an official admissions policy favoring minorities and women, subjecting white males to different admissions standards and limiting the number of seats available to them. The third admissions criteria of the policy, set forth above in full, states:

3. **We try to select a diverse group of students.**

Our students must be academically able and genuinely representative of the remarkable diversity of the City the Law School serves. We actively recruit,

---

10. Even assuming a private right of action does exist, plaintiff's Title IX claims would still fail. As discussed below, the statistics upon which plaintiff relies do not indicate discriminatory impact.

among others, students who are members of populations that have traditionally been underserved by the law and underrepresented by the profession.

(1995–1996 Application, Ortiz Decl., Ex. A; 1996–1997 Application, Burnett Decl., Ex. A). The text at the front of the catalog reads:

THE FACULTY AND STAFF OF CUNY SCHOOL OF LAW AT QUEENS COLLEGE BELIEVE THAT WE HAVE A RESPONSIBILITY TO HELP CREATE A BAR THAT IS MORE DIVERSIFIED AND MORE REPRESENTATIVE OF THE FULL RANGE OF PEOPLES WHO MAKE UP NEW YORK CITY AND THE UNITED STATES. ACCORDINGLY, WE ACTIVELY SEEK TO RECRUIT, EMPLOY, RETAIN. PROMOTE, AND TRAIN MEN AND WOMEN OF ALL RACES, NATIONAL ORIGINS, CLASSES, SEXUAL ORIENTATIONS, AND BELIEF SYSTEMS. THIS COMMITMENT IS REFLECTED IN ALL THAT WE DO, BEGINNING WITH OUR ADMISSIONS POLICY: WE LOOK AT THE WHOLE APPLICANT IN ACCORDANCE WITH THE BROAD AND INCLUSIVE CRITERIA APPROVED BY THE BOARD OF TRUSTEES OF THE CITY UNIVERSITY OF NEW YORK DESCRIBED IN DETAIL ELSEWHERE IN THIS BROCHURE.

Questions regarding this policy should be referred to Acting Associate Dean Susan Bryant

(1995–96 Law School Catalog, Weser Decl., Ex. X). Plaintiff argues that these statements indicate that an impermissible affirmative action plan was and is in place—the same alleged affirmative action plan at issue in *Davis v. Halpern*, 768 F.Supp. 968 (E.D.N.Y.1991).

In *Davis v. Halpern*, plaintiff Davis, an unsuccessful white male applicant to the Law School, like plaintiff at bar, sued the Law School alleging discrimination. The court found that plaintiff had made out a prima facie case of discrimination with respect to race and ethnicity because "a significant body of undisputed evidence clearly demonstrate[d] that [race and ethnicity] are considered in ... admissions decisions." Specifically, the court cited the following statement from the affidavit of Carlton Clark, the Director of Admissions at the time:

The Law School has no quotas by race or sex, and does not set aside seats for minorities or any groups. Because minorities and other groups are underrepresented in the legal profession and because of the diverse composition of New York City and State and the Law School's commitment to diversity in its student body, membership in underrepresented groups is one of several factors, such as GPA and LSAT scores, which Committee members may consider, in determining an applicant's request for admission.

*Id.* at 972. Defendants in that case rebutted the prima facie case by articulating the existence of an affirmative action plan. The existence of the plan was not in dispute. *Id.* at 980. The text of the statement at the front of the catalog at that time is similar to the statement at the front of the catalog relevant in this case.[11]

---

11. The text at the front of the catalog relevant in the *Davis* case read:

THE FACULTY AND STAFF OF CUNY LAW SCHOOL AT QUEENS COLLEGE BELIEVE THAT WE HAVE A RESPONSI-

BILITY TO HELP CREATE A BAR THAT IS MORE DIVERSIFIED, AND MORE REPRESENTATIVE OF THE FULL RANGE OF PEOPLES THAT MAKE UP NEW YORK CITY AND THE UNITED

However the admissions policy it makes reference to is significantly different. In *Davis*, the third admissions criteria stated, in pertinent part:

> [W]e try to select a diverse group of students, genuinely representative of the remarkable diversity of the City the School serves. We address our mandate in part by *seeking students who would otherwise be unable to attend law school, or who are members of populations that have traditionally been underserved by the law.*

*Id.* at 971–72 (emphasis added). The *Davis* court found that a triable issue of fact existed as to whether the Law School's consideration of minority status was limited to achieving constitutionally appropriate goals, or whether the Law School impermissibly considered racial and ethnic criteria because of the low number of minority members of the bar and the low proportion of minority lawyers in the city to serve a minority population in need

of legal services.[12] *See id.* at 980–83. Contrary to plaintiff's assertion, however, the court did not determine on the merits that the affirmative action plan was unconstitutional. *See id.* at 982–83.

The policy that was at issue in the *Davis* case is different from the policy at issue in this case in a number of important respects. First, the *Davis* policy makes no mention of the requirement that candidates, regardless of minority status, be otherwise qualified for admission. In fact, in stating that the Law School "seek[s] students who would otherwise be unable to attend law school," it arguably implies that less rigorous admissions standards are applied. The policy at issue in this case makes it clear that students must be academically able. Second, the admissions process in the *Davis* case, as described by the admissions director at the time, permitted consideration of an applicant's membership in an under-represented

---

STATES. ACCORDINGLY, WE ACTIVELY SEEK TO RECRUIT, EMPLOY, RETAIN, PROMOTE, AND TRAIN STUDENTS, FACULTY, AND STAFF OF ALL RACES, NATIONAL ORIGINS, CLASSES, AND BELIEF SYSTEMS, WITHOUT REGARD TO SEX OR SEXUAL PREFERENCE. THIS COMMITMENT IS REFLECTED IN ALL THAT WE DO, BEGINNING WITH OUR ADMISSIONS POLICIES: WE LOOK AT THE WHOLE APPLICANT IN ACCORDANCE WITH THE BROAD AND INCLUSIVE CRITERIA APPROVED BY THE BOARD OF TRUSTEES OF THE CITY UNIVERSITY OF NEW YORK, DESCRIBED IN DETAIL ELSEWHERE IN THIS BROCHURE.
Questions regarding this policy should be referred to Acting Associate Dean Victor M. Goode, Affirmative Action Officer
*Davis*, 768 F.Supp. at 972.

12. However, the court found that there was no material issue of fact as to whether defendants used quotas to pursue their ends and that there was no material issue of fact as to whether plaintiff was discriminated against

on the basis of sex. With respect to his sex discrimination claims, plaintiff Davis offered only statistical data that revealed that female applicants had a higher admissions rate than male applicants despite a higher number of male applicants. The court concluded that such statistics, without more, were insufficient to make out a prima facie case. *Davis*, 768 F.Supp. at 979. With respect to his claims of quotas, the *Davis* court found that in the face of defendants' denials of the use of quotas and the described admissions process which did not reference the use of quotas, the fact that plaintiff's scores were better than many admitted African–Americans or Hispanics was not circumstantial evidence of a quota. It further found that the fact that the admissions committee was apprised of the racial, demographic and sexual characteristics of the applicants, the accepted students and the enrolled students, and the fact that the percentage of minorities enrolled at the Law School was higher than that at most other law schools, were not evidence of the use of a quota. Accordingly, the claims that the Law School used quotas and the Title IX claims were dismissed. *Id.* at 980–83.

group as a positive factor. In contrast, the relevant admissions committee members in this case deny that race or gender was taken into account. (Ortiz Decl. ¶ 4, Burnett Decl. ¶ 10, Scott Decl. ¶ 10). Finally, the admissions policy at issue in this case specifies that the Law School strives to achieve diversity through recruiting efforts to attract a broad applicant pool including, among others, minority applicants. The *Davis* policy indicates that the Law School at the time directly sought to admit minority students. The relevant admissions committee members confirm that diversity is achieved through broad recruiting efforts including establishing relationships with undergraduate institutions around the country, participating in law school forums, and contacting professional organizations with members who may be interested in changing careers and pursuing public interest law. (Ortiz Decl. ¶ 7, Burnett Decl. ¶ 15, Perez Decl. ¶¶ 20–22).

Plaintiff makes much of the fact that although the faculty limit of eight students with LSAT scores below 140 was imposed in 1989, defendants argue that the admissions process at issue differs from that in the *Davis* case in that the applicants are now divided into two pools based on whether they obtained an LSAT score at or above 140. (Def.'s Reply Mem. at 19). However, the *Davis* lawsuit was initiated in 1985 and dealt with plaintiff Davis's applications from 1983 through 1990. Thus, for the bulk of the years at issue in that case, the admissions process was indeed different. Moreover, defendants note the change in the admissions process as one distinction in addition to the important distinction that in *Davis* there was direct evidence that minority status was considered in admissions decisions. (*Id.*).

Plaintiff submits portions of an American Bar Association Report in support of his claim that the Law School continued to use minority status as an admissions criteria after the *Davis* case. (*See* Report on City University of New York School of Law, Site Evaluation Visit March 12–15, 1995, Weser Decl., Ex. Y). The report states, without elaboration, that "minority status is one of four admissions criteria." (*See id.*). However, the report quotes only the introductory language of the third admissions criteria—to wit: "we try to select a diverse group of students"—and does not quote the text of the criteria that changed since *Davis*. It is unclear what the basis is for the statement, and it appears just as likely that it could be incorrect shorthand for the Law School's desire to attract a diverse, academically able student body through recruiting efforts. Significantly, the report addresses the Law School's admissions practices and statistics only through the 1994 entering class which are not relevant to this case. It notes that for the 1994–1995 application season, a new catalog had been prepared and the admissions committee had revitalized recruitment efforts. (*Id.* at 58).

On its face, the Law School's admissions policy in 1995, 1996 and 1997 does not classify persons on the basis of race or gender. It neither requires nor encourages unequal treatment of applicants. Although the policy references the school's desire for diversity and recruiting efforts to achieve it in the explanation of the admissions criteria, the policy does not favor or create a less rigorous admissions standard for members of under-served and under-represented groups, nor does it imply that seats are set aside for members of such groups.

■ In her deposition testimony, Dean Glen makes it clear that the Law School student body consists of a diverse group of qualified individuals as a result of the school's efforts to gather the largest possible applicant pool. (Glen. Dep. at 10–

13, 64–65, 78–79, Vullo Decl., Ex. C). Indeed, the ABA report submitted by plaintiff indicates that the racial makeup of the entering class reflects, on a percentage basis, the makeup of the applicant pool. (*See* Report on City University of New York School of Law, Site Evaluation Visit March 12–15, 1995 at 61–62, Weser Decl., Ex. Y). Plaintiff claims that the recruiting efforts are targeted and therefore discriminatory. However, Dean Glen attests to the fact that recruiting efforts are not targeted. (Glen Dep. at 10–13). Moreover, even if the Law School's recruiting and outreach efforts were "race conscious" in being directed at broader recruiting of minorities and women, such efforts would not constitute discrimination. Racial classifications that "serve to broaden a pool of qualified applicants and to encourage equal opportunity," but do not confer a benefit or impose a burden do not implicate the Equal Protection Clause. *Honadle v. Univ. of Vermont*, 56 F.Supp.2d 419, 427–28 (D.Vt.1999) (concluding that *Adarand* supports a distinction between "inclusive" forms of racial classification, such as recruitment and outreach, and "exclusive" forms, such as quotas and set-asides). In addition, as stated by Dean Glen, the Law School:

> consciously appl[ies] standards that do not disproportionately exclude people based on race or economics and applying those criteria as opposed to pure numbers which are what most law schools do ... end up with a more diverse student body.

(Glen Dep. at 78, Vullo Decl., Ex. G). Thus, the natural product of the Law School's practice of looking at the "whole applicant in accordance with ... broad and inclusive criteria," (1995–1996 Law School Catalog, Weser Decl., Ex. X), and the Law School's broad recruiting efforts is diversity. The fact that the Law School's admissions policy was designed not to exclude disproportionately certain applicants does not constitute classification on the basis of race or gender. Since there is no implication in the policy that applicants are subject to different standards or otherwise treated differently, the policy itself, although protective of certain groups, is not discriminatory. *See Hayden v. County of Nassau*, 180 F.3d 42, 48–49 (2d Cir.1999) (police officers' entrance examination, designed to minimize adverse impact on minority applicants, did not constitute a facial classification on the basis of race in violation of equal protection). Consciousness of race and gender in the formulation of an admissions policy is not tantamount to discrimination, provided the admissions policy is applied uniformly.[13] *See id.* at 49. Thus, the admissions policy is facially neutral.

### The Admissions Policy was not Discriminatorily Applied

Plaintiff also contends that admissions committee members applied the admissions policy in a discriminatory manner, impermissibly considering race and gender in their determinations. Plaintiff asserts that he was rejected because the admissions committee members favored minori-

---

**13.** Consciousness of race and gender in collecting data on an applicant pool and those accepted from the pool also does not amount to a racial classification. *See Honadle*, 56 F.Supp.2d at 428 (concluding that because racial awareness in amassing statistics on the racial and ethnic makeup of the university's faculty does not impose burdens or benefits, or subject individuals to unequal treatment, such activity does not trigger strict scrutiny under the Equal Protection Clause). Thus, contrary to plaintiff's contention, the fact that the Law School amasses statistics on its incoming class that are given to members of the admissions committee does not constitute a violation of the Equal Protection Clause. (*See* Weser Decl., Ex. Z).

ties and women and subjected them to lower standards, set aside seats for minorities and women, selected minorities of their same group for admission, and applied the public interest admissions criteria to favor minorities. (Weser Dep. at 44–57, 94–100, Vullo Decl., Ex. B).

Under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applicable to discriminatory treatment claims, *see, e.g., Woodbury v. New York City Transit Authority,* 832 F.2d 764, 768 (2d Cir.1987), plaintiff carries the initial burden of establishing a prima facie case that he was denied admission because of discrimination. This burden is a "minimal" one. *Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 146 (2d Cir.1999); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997). The burden then shifts to defendants to articulate a legitimate, nondiscriminatory reason for rejecting plaintiff.[14] Once a legitimate, nondiscriminatory reason is put forth, "the presumption of discrimination arising with the establishment of the prima facie case drops from the picture." *Weinstock v. Columbia University,* 224 F.3d 33, 42 (2d Cir.2000) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) and *Fisher,* 114 F.3d at 1336). The ultimate burden rests with plaintiff to show that defendants' stated reason is a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25; *see also Davis,* 768 F.Supp. at 974 (setting out burdens of production and persuasion). As stated by the Second Circuit:

> plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered ... were false, and that more likely than not discrimination was the real reason [for the action adverse to plaintiff]. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.

*Weinstock,* 224 F.3d at 42 (noting that this framework was reaffirmed by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)) (internal quotations omitted).

In a reverse discrimination case, the existence of an affirmative action plan constitutes a legitimate, nondiscriminatory reason for rejection, shifting the burden back to the plaintiff to demonstrate pretext and the invalidity of the plan. *Johnson v. Transp. Agency, Santa Clara County,* 480 U.S. 616, 626–27, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987); *Davis,* 768 F.Supp. at 974 (citing *Johnson* ). However, in this case, in contrast to the *Davis* case, defendants deny the existence of an affirmative action plan. Instead, defendants contend that plaintiff was rejected because his academic qualifications and demonstrated commitment to public service were inadequate—also a legitimate, nondiscriminatory reason.

According to defendants, plaintiff was denied admission primarily because of his

---

14. Because, as discussed below, defendants have adequately put forth a legitimate, nondiscriminatory reason for rejecting plaintiff, the Court need not consider whether plaintiff has made out a prima facie case. As stated by the Supreme Court, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *accord Fagan v. New York State Elec. & Gas Corp.,* 186 F.3d 127, 132 (2d Cir.1999).

low LSAT score. In addition, his GPA was significantly discounted because of the nontraditional nature of his undergraduate program and its performance measures. His commitment to public service was also judged lacking. Plaintiff takes issue with defendants' attack on his undergraduate record and minimization of his public service commitment, noting that in response to interrogatories "low LSAT" was the sole reason given for his rejection. (Resp. to Pl.'s First Set of Interrogs., Resp. to Interrog. No. 1, Weser Decl., Ex. A). Further, plaintiff contends that other applicants from his college have been accepted.[15] Indeed, the Court notes that defendants' criticisms of plaintiff's undergraduate record and personal statement now presented in support of this motion seem somewhat exaggerated. However, each of the other Empire State graduates who were offered admission achieved higher LSAT scores, including an African–American male applicant with a GPA of 2.09 who had LSAT scores of 139 and 131. That applicant's average score of 135 is higher than plaintiff's average score of 130.

Moreover, plaintiff's low LSAT score in and of itself constitutes a legitimate nondiscriminatory reason for refusing him admission. When asked whether LSAT score alone should be a basis for denying admission, Dean Glen responded:

15. In 1995, the following Empire State College graduates were admitted:

| gender | race | LSAT | GPA |
|--------|------|------|------|
| male | white | 150 | 2.87 |
| female | white | 145 | 0.00 * |
| female | white | 146 | 3.67 |
| female | Hispanic | 143 | 2.41 |
| female | white | 150 | 3.19 |

(1995 Admissions List, Ortiz Decl., Ex. B). In 1996, the following Empire State College graduates were admitted:

| gender | race | LSAT | GPA |
|--------|------|------|------|
| female | Hispanic | 160 | 0.00 * |

LSAT scores is one predictor of the capacity to successfully complete our program.... [W]e learn every year from our graduates and from the experience of our graduates we have certainly come to know that there are numbers in the LSAT beneath which I think it is fair to say no student who we have taken has been successful, either in terms of getting through the program or passing the bar.

(Glen Dep. at 69–70, Vullo Decl., Ex. C). As set forth in detail below, only two applicants with LSAT scores of 133 were admitted to the Law School during the relevant years, and both of those applicants were white males.[16]

Even if defendants' proffered reasons were rejected, plaintiff has not met his burden. See Reeves, 530 U.S. at 148, 120 S.Ct. at 2109 ("there will be instances where, although the plaintiff ... has set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."). Plaintiff relies on statistics comparing the admissions of women and minorities to those of white men in the relevant years as evidence that defendants' proffered reasons for his rejection are a pretext for discrimination. However, his statistics do not support a reasonable inference of discrimination.

| female | white | 151 | | 2.94 |
|--------|-------|-----|---|------|
| female | white | 147 | | 3.18 |
| male | African–American | 139; | 6/95 | 2.09 |
| | | 131; | 9/95 | |
| female | white | 143 | | 3.16 |

(1996 Admissions List, Burnett Decl., Ex. C). No Empire State College graduates were admitted in 1997.

* GPA appears as 0.00 on admissions list.

16. In fact, as discussed below, one of those applicants took the LSAT multiple times and his average LSAT score was higher than that of plaintiff.

■ Statistics may be used as circumstantial evidence to support an individual disparate treatment claim. *Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir.1999); *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir.1999); *Stratton v. Dept. for the Aging for City of New York*, 132 F.3d 869, 877 (2d Cir.1997). As set forth in *Smith*, an employment discrimination case, use of statistics comparing the treatment of persons competing against each other is appropriate. *See Smith*, 196 F.3d at 370. ("[A] disparate treatment claim looks at how an individual was treated compared to ... similarly situated coworkers. Thus, statistical analyses that compare coworkers who competed directly against each other to receive a benefit ... are appropriate."). However, statistics based on groups including persons against whom a plaintiff was not compared are not appropriate. *Id.* (statistics that pooled some plaintiffs with workers with whom they were not compared were inadequate). Moreover, statistics based on manipulated data groupings designed to indicate discrimination are not probative. *See Hollander*, 172 F.3d at 203 (statistics showing job elimination rates based on age groupings were found not probative where groupings were manipulated to include plaintiff's age in group with much higher rate). In addition, a plaintiff relying on statistics must account for other potential causes of the disparity shown by the statistics. *Smith*, 196 F.3d at 371 (citing *Hollander* among other cases) (hypothesis testing showing that chance was most likely not responsible for disparity cannot by itself support inference of discrimination). Statistics must also be based on a sufficient sample size to sustain a reasonable inference. As stated by the Second Circuit in *Pollis v. New Sch. for Social Research*, 132 F.3d 115 (2d Cir.1997):

A statistical showing of discrimination rests on the inherent improbability that the institution's decisions would conform to the observed pattern unless intentional discrimination was present. The smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it. Thus, several courts have ruled, as a matter of law, that discrimination may not be proved by statistics involving so small a pool.

*Id.* at 121 (citing *Mayor of Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) (statistics relating to thirteen-member panel were insufficient because of small sample size) and *Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir.1984) (ten terminations over eleven-year period constitutes insufficient sample size) among others); *see also McCarthy v. New York City Technical Coll.*, 202 F.3d 161, 165 (2d Cir.2000) (sample of two insufficient).

■ Specifically, plaintiff lists the following statistics in support of his claims of race discrimination:

As an example, there were 44 Black and Hispanic applicants who scored 151 and above on the LSAT who applied in 1997. Of these, 43 were offered admission for a percentage of 97%. Yet only 82% (57 out of 70) of white males with such scores were offered admission. Ninety applicants in 1997 with scores of between 120 and 144 were offered admission and of those, only 4 were white males.

The percentage of white students comprising the entering class decreased from 68% in 1995 to 54% in 1996 to 44% in 1997. The percentage of white males in those years decreased from 32% to 13.5%! In all three of those years, the percentage of white applicants with

scores of 151 and above who were offered admission was lower than minority applicants. In the 1995 class, only 3 out of 18 students with LSAT scores of 140 and less were white males. In 1996, it was two out of 19. In 1997, it was zero out of 20.

(Pl.'s Mem. of Law in Opp'n at 10) (citation omitted). These statistics do not support plaintiff's claims. As an initial matter, plaintiff was compared only to candidates with LSAT scores below 140 and subject to an admissions process based on his LSAT scores that differed from the process for applicants with scores of 140 and above. Thus, statistics based on applicants with scores of 151 and above are not probative both because those applicants were not compared to plaintiff and because the statistics are based on an artificial data grouping. Furthermore, plaintiff's statistics reveal that a substantial portion of white male applicants with LSAT scores of 151 and above were indeed offered admission in 1997.[17] Similarly, in 1995 and 1996, a substantial portion of white applicants and white male applicants with LSAT scores of 151 and above were offered admission.[18] Further, plaintiff's statistics indicate that in 1995, 31% of the white, African–American and Hispanic male applicants, considered as a group, were offered admission, as compared to 28% of white male applicants. (See Weser Decl. ¶¶ 49(iv), 49(vi)). For 1996, plaintiff's own statistics directly contradict his claim. In that year, 42% of the white, African–American and Hispanic male applicants were offered admission as compared to 45% of white male applicants. (Weser Decl. ¶¶ 49(ix), 49(xi)). Plaintiff's assertion that only four out of ninety admitted applicants with scores of between 120 and 144 were white males is based on an arbitrary subset of applicants. Moreover, the decline in the percentage of all white students, as well as white male students, comprising the entering class is easily explained by the fact that the absolute number of white applicants, and white male applicants in particular, as well as the percentage of the applicant pool represented by such applicants, dramatically declined in those years.[19] This cause was not considered by plaintiff. Finally, plaintiff's statistics regarding students with LSAT scores of 140 and below are also based on an artificial category. As

---

17. As stated by plaintiff, 82% of white males, as compared to 97% of African–American and Hispanic applicants, with scores of 151 and above were offered admission in 1997. Plaintiff does not cite statistics for the admissions rate of white applicants, males and females combined, for 1997.

18. In 1995, 42.7% of white applicants with scores of 151 and above, and 28% of white male applicants with scores of 151 and above, were offered admission, as compared to 60% of African–American and Hispanic applicants. In 1996, 60% of white applicants with scores of 151 and above, and 45% of white male applicants with scores of 151 and above, were offered admission, as compared to 73% of African–American and Hispanic applicants. (Weser Decl. ¶¶ 45(v)–45(vii), 45(x)–45(xii)).

19. In 1995, 613 white, non-Hispanic males and 499 white, non-Hispanic females applied. In 1996, 437 white, non-Hispanic males and 416 white, non-Hispanic females applied. In 1997, 260 white, non-Hispanic males applied, and 267 white non-Hispanic females applied. In 1995, 136 African–American males and 207 African–American females applied. In 1996, 135 African–American males and 211 African–American females applied. In 1997, 101 African–American males applied, and 178 African–American females applied. In 1995, 99 Hispanic males and 91 Hispanic females applied. In 1996, 79 Hispanic males and 102 Hispanic females applied. In 1997, 83 Hispanic males applied, and 82 Hispanic females applied. (Defs.' Resp. to Pl.'s Third Set of Interrogs., Interrog. Nos. 1, 9, 17, 25, 33, 41, 49, 57, 65, Weser Decl., Ex. S).

described above, students with scores of *below* 140 are subject to a different admissions process. Whether considered in isolation, or as a whole, the statistics are insufficient to support an inference of race discrimination.

In support of his claims of gender discrimination, plaintiff offers the following:

[S]ince its first class in 1983, in every year, the school has offered more admission to females than males. Furthermore ... except for one year, from 1985 to 1991, less females applied for admission that males, but more were offered admission. Even in years where there were more females applying than males, a higher percentage of females were accepted than applied. Defendants have justified this higher percentage by saying women as a whole demonstrate better qualifications.

Females comprised 53% to 64% of the entering class from 1995 to 1997. More females were offered admission than males in each of those years. In 1995 and 1996, of those applicants receiving an LSAT score of 151 or higher, a significantly greater percentage of females than males were offered admission. The percentage of white males in the entering classes decreased from 32% in 1995 to 13.5% in 1997!

(Pl.'s Mem. of Law in Opp'n at 10–11) (citations omitted). These statistics, like those offered to show race discrimination, do not provide a basis for inferring gender discrimination. Statistics relating to years not in issue are irrelevant, and, as noted above, statistics relating to applicants with LSAT scores of 140 and above are not probative. Moreover, the fact that in some years a greater percentage of women are accepted despite making up a smaller percentage of the applicant pool can be legitimately explained by the fact that women applicants to the Law School may, on the whole, be better qualified.[20] As noted by the *Davis* court, the statistical disparity could also be explained by a "a greater affinity for [the] Law School's unique curricular approach" or "greater enthusiasm for ... public service careers." *Davis,* 768 F.Supp. at 979. In addition, contrary to what plaintiff's presentation implies, the change in percentage of women in the entering class over the three relevant years did not steadily increase.[21] Furthermore, the Court notes that over those three years the percentage of women in the applicant pool increased from 48.4% to 54.3%. (Defs.' Resp. to Pl.'s Third Set of Interrogs., Interrog. Nos. 1, 9, 18, 25, 33, 41, 49, 57, 65, Weser Decl., Ex. S). Similarly, in 1995, the fact that 63% of white, African–American and Hispanic females with LSAT scores of 151 and above were offered admission as compared to 31% of white, African–American and Hispanic males is based on an irrelevant and arbitrary grouping and is not indicative in light of the fact that overall 25% of the female applicants were offered admission as compared to 20% of the male applicants. (Weser Decl. ¶¶ 49(iv)–49(v), 49(vii)-(vii)). Nor does the fact that in 1996, 73% of white, African–American and Hispanic fe-

---

**20.** The American Bar Association Report submitted by plaintiff states that Dean Ortiz attributed the 1994 increase in acceptances of women to the "excellent presentation many women made in their applications, reflecting many more significant life experiences related by them than by male applicants." (Report on City University of New York Law School, Site Evaluation Visit March 12–15, 1995, at 62, Weser Decl., Ex. Y).

**21.** As set forth by plaintiff in his declaration, women made up 53% of the class of 1995, 64% of the class of 1996 and 60% of the class of 1997. Thus, although the percentage increased from 1995 to 1996, it did not increase each year for the three years.

males with LSAT scores of 151 and above were offered admission as opposed to 42% of white, African–American and Hispanic males, given that 38.5% of female applicants were offered admission as compared to 26.5% of male applicants, support an inference of discrimination. (Weser Decl. ¶¶ 49(ix)–49(x), 49(xii)–49(xiii)). Finally, the decrease in the percentage of white males in the class, as noted above, corresponds to a dramatic decrease in the percentage of white male applicants, a factor not accounted for by plaintiff.

The statistics pertaining to admissions of applicants with LSAT scores less than 140, although a small sample, also do not support an inference of discrimination. Admissions in 1995 of applicants with LSAT scores of less than 140 were as follows:

| gender | race | LSAT | GPA |
|---|---|---|---|
| male [22] | white | 133 | 3.44 |
| male [23] | white | 129; year1994 | 2.84 |
| | | 132; year1993 | |
| | | 133; year1992 | |
| male | Latino | 138 | 2.71 |
| female | Latino | 138 | 2.79 |
| male | Latino | 138 | 3.52 |
| male [24] | Latino | 138 | 3.03 |
| male | Latino | 139 | 2.50 |

| | | | |
|---|---|---|---|
| female | Asian | 139 | 3.04 |
| female | African–American | 138 | 3.13 |

(1995 Admissions List, Ortiz Decl., Ex. B).[25] Admissions in 1996 of applicants with LSAT scores below 140 were as follows:

| gender | race | LSAT | GPA |
|---|---|---|---|
| male | white | 136 | 2.52 |
| female | Latino | 139 | 3.04 |
| female | Latino | 139 | 3.04 |
| male [26] | Latino | 138 | 3.77 |
| male | African–American | 139 | 2.09 |
| male | African–American | 134 | 4.0 |
| male | African–American | 137 | 3.23 |

1996 Admissions List, Burnett Decl., Ex. C; *see also* Burnett Decl. ¶ 22).[27] Finally, admissions in 1997 of applicants with LSAT scores below 140 were as follows:

| gender | race | LSAT | GPA |
|---|---|---|---|
| female [28] | African–American | 136 | 2.31 |
| female | African–American | 139 | 2.74 |
| female [29] | white | 137 | 3.47 |

(1997 Admissions List, Perez Decl., Ex. D).

The statistics for 1995 and 1996 indicate, contrary to plaintiff's assertions, that white applicants and male applicants were not held to a higher standard. In both of those years, the majority of the admitted applicants were men and their LSAT scores were lower than those of the women. Moreover, in 1995, the two admitted

22. The full application file is attached as Exhibit D to the Ortiz Declaration.

23. The full application file is attached as Exhibit C to the Ortiz Declaration.

24. This applicant, although admitted, did not enroll.

25. Defendants' Reply Memorandum and letter to the Court submitted to clarify certain points made during oral argument indicate that a white female graduate of New York University with a GPA of 3.75 was admitted in 1995 with the same or lower LSAT score as plaintiff. (*See* Def.'s Reply Mem. at 5; Letter from Stephanie Vullo, dated February 9, 2001, at 2). However, the admit sheets indicate that her score was a 32. (1995 Admissions List, Ortiz Decl., Ex. B). The Court assumes that this is an LSAT score on a scale of 48, and therefore it is not the same or lower than plaintiff's score. This interpretation is supported by the declaration of Victo-

ria Ortiz. (*See* Ortiz Decl. ¶¶ 11–12) (stating that only two applicants in 1995 had similar LSAT scores as plaintiff, both of whom were white males).

26. This applicant, although admitted, did not enroll.

27. Burnett indicates in her declaration that a white female with an LSAT of 139 and a GPA of 3.9 was admitted. However, the admissions list indicates an LSAT score of 35. The Court assumes that this is an LSAT score on a scale of 48, and therefore the student was not subject to the admissions procedure for applicants with scores below 140, equivalent to a 21 on a scale of 48.

28. This applicant, although admitted, did not enroll.

29. This applicant, although admitted, did not enroll.

applicants with the lowest LSAT scores were white men.[30] Of the seven applicants admitted in 1996, only one, an African–American male with a 4.0 GPA from the College of New Rochelle, had a lower LSAT score than the white male who was admitted. The white male had a 2.52 GPA from St. John's University. In 1997, three women and no men were offered admission from the pool of applicants with LSAT scores below 140. Of the three, one woman was white and the other two were African–American. All three had LSAT scores higher than plaintiff. In fact, apart from the two white males admitted in 1995 with LSAT scores of 133, *all* of the admitted applicants in *all* of the relevant years had higher LSAT scores than plaintiff.[31]

In sum, these statistics do not support a rational inference of intentional discrimination.[32] Plaintiff has failed to raise a triable issue of fact with respect to pretext. Accordingly, summary judgment is appropriate dismissing plaintiff's claims under Title VI and Title IX. *See Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (discussing the appropriateness of summary judgment in light of the Supreme Court's decision in *Reeves* ). In addition, plaintiff's claims for an injunction prohibiting Dean Glen and her agents from discriminating on the basis of race and gender, for an order admitting him to the Law School and for a declaratory judgment that the Law School's alleged affirmative action policy is unconstitutional are dismissed.

### Remaining Claims

Given the Court's conclusion that plaintiff has not produced evidence sufficient to support a rational inference of intentional discrimination, plaintiff's remaining claims of racial, gender and religious discrimination in violation of 42 U.S.C. §§ 1981, 1982 and 1983 also fail. To prevail under Section 1981, plaintiff must prove discriminatory intent. *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir.2000) (citing *General Bldg. Contractors v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982)). Similarly, Section 1982 requires a discriminatory motive. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987) (violation requires that interference was motivated by racial animus directed toward protected group). In addition, although Section 1983 itself does not require the intent to violate constitutional rights, "where the underlying constitutional deprivation, such as an equal protection violation under the Fourteenth Amendment, calls for [intent]" it

---

**30.** One of these applicants had a 2.84 GPA from St. John's University, a traditional institution, and a history of community service including counseling teenagers for approximately two hours a day. The other applicant attended John Jay College and earned a 3.44 GPA. He had overcome numerous hardships including heroin addiction, conviction and imprisonment for burglary, robbery and sale of heroin, and had interned for the Criminal Division of the Legal Aid Society. (*See* Ortiz Decl. ¶¶ 13–14 & Exs. C & D).

**31.** As indicated in the table above, one of the white males accepted in 1995 took the LSAT three times. Like plaintiff, his highest score

was a 133. However, his lower scores, 132 and 129, were both higher than plaintiff's lower score of 127. Moreover, his average score of over 131 is higher than plaintiff's average score of 130. Thus, plaintiff's average score is lower than the score, averaged if applicable, of any other admitted applicant in the record.

**32.** Because plaintiff's statistics do not indicate any discriminatory impact, plaintiff cannot make out a claim that the admissions policy is motivated by discriminatory animus and results in a discriminatory effect.

must be demonstrated by plaintiff. *Hudson v. New York City,* 271 F.3d 62, 68 (2d Cir.2001); *see also Brown,* 221 F.3d at 338 (Section 1983 claim based on equal protection violation requires discriminatory intent). Further, the statistical evidence relied upon by plaintiff provides no support for his claim of religious discrimination. Indeed, applicants were not asked to identify their religion.

In addition, plaintiff's religious discrimination claims against the Law School are barred by the Eleventh Amendment, and defendants Glen, Ortiz and Scott enjoy qualified immunity precluding claims against them in their individual capacities for damages. Dean Glen was not personally involved in denying plaintiff admission as required for an award against her under Section 1983, and plaintiff has no property interest in admission to the Law School to support a claim under Section 1982. For all of these reasons, plaintiff's remaining claims must be dismissed.

### CONCLUSION

Defendants' motion for summary judgment is granted with respect to all claims. The Clerk of the Court is directed to enter judgment in defendants' favor in accordance with this decision.

SO ORDERED.